## STATE v. STOCKWELL et al.

(134 N. W. 767.)

Chapter 85 of the Session Laws of 1901 (§§ 868 to 876, Code 1905) provided for the payment of $2 fee for each applicant for teacher's certificate, and that one dollar thereof should be transmitted to the superintendent of public instruction "to be used by him for such clerical assistance as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith," and that to do said work the state superintendent "may appoint such clerical assistants as he may deem necessary, but the expenditures therefor shall not exceed in the aggregate the sum annually collected from applicants for county certificates for this purpose." During defendant's incumbency of said office there was collected from this course $17,714, of which $11,816 was disbursed, leaving unexpended $5,598. This balance is retained by defendant under his claim of ownership founded upon his claims, viz.: (a) That the fund was intended as a private fund and that any balance thereof remaining belonged to him individually; (b) that the right to use necessarily carried with it the ownership of the fund, the statute not requiring the same to be covered into the state treasury nor an accounting therefor from the officer; (c) that the statute creating the fund prescribed new and additional duties for the office and that the legislative intent should be that the balance remaining of the fund should belong to the officer as compensation for such added duties of office; (d) that under the facts that the balance remains unexpended because the defendant personally performed the duties during times when not otherwise necessarily engaged in the performance of his official duty, the defendant was entitled to the reimbursement that otherwise would have been

Note.—A question similar to the one involved in this case is treated in a note in 30 L.R.A.(N.S.) 810, on the right of a clerk on a salary basis to retain fee for naturalization. The authorities there reviewed show that it is generally held that a clerk on a fixed salary is not entitled to retain as his own the fees received in naturalization cases by virtue of his office.

paid to clerical assistants; and that because the fund was saved by his own personal exertions, instead of expended for clerical assistants, defendant is entitled to said balance remaining of the fund; (e) that the practical construction of the statute in question by such officer, and his predecessor, and the various executive state officers, has always been that such balance of the fund belonged to the officer, and such construction is urged as controlling; (f) that the allowance of such additional compensation does not contravene the terms of § 84 of the state Constitution against the increasing or decreasing of official salaries during the period for which the officer shall have been elected.

Under the above it is *held:*

**Superintendent of public instruction — ownership of funds in hands of — accounting.**

(1) That the fund created by said $1 payments at all times since collection is and has remained a public fund and the balance unexpended is a balance of one of the public funds of the state for which the defendant is accountable to the state.

**Superintendent of public instruction — ownership of funds in hands of — accounting.**

(2) That the legislature, in providing this fund and authorizing its use for declared purposes and constituting the incumbent of the office of state superintendent of public instruction, the paymaster authorized to disburse from the fund for certain duties for which he was allowed to employ clerical assistants did not thereby constitute the officer the owner of the fund. The right of use conferred was the right to disburse in payment for such service germane to the duties of the office.

**Ownership of funds in hands of public officer — legislative intent.**

(3) That the legislative intent must be clear and the statute must evidence a plain intent to grant public funds to a public officer occupying a salaried office, otherwise the fund remains the property of the state, conceding without deciding the authority of the legislature to give to the officer the ownership of such funds.

**Ownership of fund in hands of public officer — burden of proof.**

(4) That the collection of the moneys by the defendant under color of office being admitted, the burden of establishing title thereto in the individual is upon such public officer claiming to own the fund, and not upon the state to establish want of ownership on the part of the state officer.

**Public officers — compensation — extra work.**

(5) A public officer cannot increase his salary by performance of official duty under claim of its performance after regular office hours, nor by himself performing office duty in lieu of employing office assistants authorized by statute. And the officer can make no claim to public moneys a necessity for the expenditure of which is avoided by his own performance of official duty.

**Public officers — right to fees — practical construction of statute.**

(6) There being no plain statutory intent that the fees in question should belong to the officer as emoluments of office, any practical construction of such statute by the previous incumbent of the office and of other state executive officers is immaterial, as such construction cannot be permitted to contradict, overrule, or supplement the plain terms of the statute.

**Public officers — compensation — increased duties.**

(7) That the salary attached to a public office is but an incident of the office, and an increase in official duty does not necessarily imply or exact an increase of salary.

**Public officers — fees — duty to account for.**

(8) That under the statutes of this state, §§ 420 and 421, Revised Codes 1905, formerly existing as § 358, Revised Codes 1895, §§ 98, 101, and 103 of the Codes of 1905, in force throughout defendant's incumbency of this office, it was the duty of the defendant at a no later date than the expiration of each term of office, to account to the state and cover into the state treasury any balance remaining of the fees collected from this source during such two-year term of office.

**Public officers — fees — duty to account for.**

(9) Under the above holding that the state is the owner of the moneys in suit, and that the defendant must account and is liable therefor to the state on his official bond, the constitutional question that would be involved by a contrary construction of the statute is without the case, and is not passed upon.

**Public officers — fees — duty to account for.**

(10) This balance in suit are fees and profits arising from said office mentioned in, covered by, and within the meaning of § 84 of the state Constitution, requiring the same to be paid into the state treasury.

Opinion filed October 12, 1911.  On petition for rehearing February 14, 1912.

Appeal by defendant Stockwell from a judgment of the District Court for Grand Forks County, *Templeton,* J., in plaintiff's favor in an action brought to recover certain unexpended balances retained by defendant under claim of ownership after expiration of his term of office.

Affirmed.

*Gray & Myers,* for appellant.

That portion of § 84 of the Constitution, "and all fees and profits arising from any of said offices shall be covered into the state treasury,"

is not self-executing. Woodworth v. Bowles, 61 Kan. 569, 60 Pac. 331; Rowland v. Forest Park Creamery Co. 79 Kan. 134, 99 Pac. 212; Griffin v. Rhoton, 85 Ark. 89, 107 S. W. 380; State ex rel. Ohlquist v. Swan, 1 N. D. 5, 44 N. W. 492; Roesler v. Taylor, 3 N. D. 546, 58 N. W. 342; Engstad v. Grand Forks County, 10 N. D. 54, 84 N. W. 577; Lewis v. Lackawanna County, 200 Pa. 590, 50 Atl. 162; Re Cahill, 110 Pa. 167, 20 Atl. 414; State ex rel. Barron v. Cole, 81 Miss. 174, 32 So. 314; French v. Teschemaker, 24 Cal. 518; Chittenden v. Wurster, 152 N. Y. 345, 37 L.R.A. 809, 46 N. E. 857.

Concluding clause of § 84 of the Constitution does not, directly or otherwise, impose a limitation upon the right of the legislative authority to thereafter compensate those officers thereby affected, by means of specific fees, for the performance of such new duties as might be legislatively required of them. State ex rel. Edgerly v. Currie, 3 N. D. 317, 55 N. W. 858.

Fund created by §§ 869 and 876 of Code not necessarily composed of "fees" and "profits." State ex rel. McGrath v. Walker, 97 Mo. 162, 10 S. W. 473.

*Andrew Miller,* Attorney General, *Alfred Zuger,* and *C. L. Young,* Assistant Attorneys General, for the State.

Provision of § 84 of the Constitution, with reference to covering all fees and profits arising from any of the state offices into the state treasury, is self-executing. Cooley, Const. Lim. pp. 119–123; Willis v. St. Paul Sanitation Co. 48 Minn. 140, 16 L.R.A. 281, 31 Am. St. Rep. 626, 50 N. W. 1110, 53 Minn. 370, 55 N. W. 550; State ex rel. Roberts v. Weston, 4 Neb. 216; Thomas v. Owens, 4 Md. 189; Reynolds v. Taylor, 43 Ala. 420; Miller v. Marx, 55 Ala. 322; People v. Hoge, 55 Cal. 612; Swift & Co. v. Newport News, 105 Va. 108, 3 L.R.A. (N.S.) 404, 52 S. E. 821; Davis v. Burke, 179 U. S. 399, 45 L. ed. 249, 21 Sup. Ct. Rep. 210; State ex rel. Lincoln v. Babcock, 19 Neb. 230, 27 N. W. 94; Ex parte Snyder, 64 Mo. 58; United States v. Reese, 92 U. S. 214, 23 L. ed. 563; Parker County v. Jackson, 5 Tex. Civ. App. 36, 23 S. W. 924; State v. Holmes, 12 Wash. 169, 40 Pac. 735, 41 Pac. 887; San Francisco & N. P. R. Co. v. State Bd. of Equalization, 60 Cal. 12; Day v. Day, 12 Idaho, 566, 86 Pac. 531, 10 Ann. Cas. 260; State ex rel. Murray v. Voorheis, 50 La. Ann. 985, 24 So. 132; Winchester v. Howard, 136 Cal. 432, 89 Am. St. Rep. 193,

64 Pac. 692, 69 Pac. 77; Mallon v. Hyde, 76 Fed. 388; Nickerson v. Crawford, 74 Minn. 366, 73 Am. St. Rep. 354, 77 N. W. 292; Farmers' Loan & T. Co. v. Funk, 49 Neb. 353, 68 N. W. 520.

No claim for additional compensation can be made in the absence of an express legislative grant of such compensation. Mechem, Pub. Off. § 862; Throop, Pub. Off. 478–479; 1 Dill. Mun. Corp. § 233, 4th ed.; Evans v. Trenton, 24 N. J. L. 764; People v. New York, 1 Hill, 362; United States v. King, 147 U. S. 676, 37 L. ed. 328, 13 Sup. Ct. Rep. 439. See also Broaddus v. Pawnee County, 16 Okla. 473, 88 Pac. 250.

Person who accepts office to which no compensation is attached is presumed to undertake to serve gratuitously, and cannot recover anything upon the ground of implied contract to pay what the services are worth. Johnson v. Black, 103 Va. 477, 68 L.R.A. 264, 106 Am. St. Rep. 901, 49 S. E. 633; Jones v. Lucas County, 57 Ohio St. 189, 63 Am. St. Rep. 710, 48 N. E. 882; United States v. Saunders, 120 U. S. 126, 30 L. ed. 594, 7 Sup. Ct. Rep. 467; Throop, Pub. Off. 443.

General usage cannot be resorted to, to escape liability, and therefore the defendant is liable. Whittemore v. People, 227 Ill. 453, 81 N. E. 427, 10 Ann. Cas. 44. See also Throop, Pub. Off. § 445, and Lewis, Stat. Constr. § 473; Ogden v. Maxwell, 3 Blatchf. 319, Fed. Cas. No. 10,458; Albright v. Bedford County, 106 Pa. 582.

Goss, J. There is no conflict as to the facts in this case. It stands admitted that during the three terms defendant and appellant served in public office as the superintendent of public instruction in this state there came regularly into his possession by virtue of his office the sum of $17,714, as the proceeds of that number of $1 payments contributed by that number of teachers under the provisions of § 876 of the Revised Codes of 1905, or chap. 85 of the Session Laws of 1901. Under this statute each applicant for teacher's certificate on examination therefor paid a fee of $2 to the county superintendent of schools of such county wherein the examination was held, $1 of which $2 fee the county superintendent was obliged by law to pay into the county teachers' institute fund, and the other $1 thereof to forward to the superintendent of public instruction. It is admitted that of such total collection by the

defendant as state superintendent he disbursed $11,815, leaving unexpended $5,898 as a balance retained by him personally after the expiration of his term of office, under his claim in good faith that he is entitled to retain same as owner thereof; and that acting thereon to determine the law involved this action has been brought. The lower court awarded judgment in favor of the state, and defendant appeals.

This matter is primarily one of statutory construction. The sections to be construed are §§ 876 and 869, providing for the collection and creation of the fund and for its expenditure. The statute creating the fund does not expressly or explicitly command an accounting by the officer to the state for the fund, or direct disposition of any balance that may remain unexpended therein, while the statute itself in terms provides the official may disburse it, designating, however, the purposes for which it may be so expended.

This legislation originates with chap. 62 of the Session Laws of 1890, the important features of which defines the duties of the office of superintendent of public instruction; providing in § 5 of the law that it shall be the duty of such officer to prepare all questions used in the examination of applicants for teacher's certificates, prescribe the rules and regulations for conducting all such examinations, and issue or revoke state certificates when provided by law. His duty in such respect remained unaltered as § 626 of the Code of 1895, and § 736 of the Code of 1899; and until 1901 this duty and the work involved rested upon the various county superintendents. By chap. 85 of the Session Laws of 1901 this duty was placed with the state superintendent. And in addition to the fee of $1 formerly required to be paid by the applicant to the county superintendent, used by the county superintendent in support of teachers' institutes in the county or in the support of teachers' training schools (see § 743, Code of 1899) a $1 addition to the fee was required, making the fee paid by the applicant for certificate $2. The section of statute requiring the fee as enacted in chap. 85 of the Session Laws of 1901 is as follows: "Sec. 743. Fee for Certificate. Each applicant for a county certificate shall pay $2 to the county superintendent, $1 of which shall be paid into the county teachers' institute fund, to be used in support of teachers' institutes or the teachers' training schools in the county, as otherwise provided, and $1 of said fee shall be used by the superintendent of public instruction for such clerical assistance as he

may deem necessary and competent for the reading of teachers' answer papers and work connected therewith. It shall be the duty of the county superintendent immediately after each examination to forward $1 for each applicant for teachers' certificate to the superintendent of public instruction, such sums to be used by him as hereinbefore provided."

Under another and preceding section of the same law a fee of $1 was required to be paid into the institute fund of the county in cases of removal or validation of certificates by indorsement by the county superintendent as by law provided.

The question before us for determination is: Do the provisions of §§ 869 and 876 authorize the claim of the defendant in this case that the balance of the unexpended fee provided in those sections belongs to him under a reasonable construction of the two sections referred to? One basic fact must be considered as having an important bearing in this matter. We are dealing with one of the state funds. This surplus is but a balance remaining of a fund collected by virtue of official employment in the exercise of official duty by a county officer in a matter germane to the duties of such officer, and is, in its collection and transmission to a state officer charged by law with the duty to receive it, a state fund,—public money. The mode of collection impresses it with these characteristics. Indeed, an equal amount, the other one half the fee collected from the same source, goes into a designated public fund created by the same statute, named the "teachers' institute fund" of the county wherein it is collected. It would be strange reasoning, indeed, that would conclude that $1 of every collection belonged to some person individually, holding public office, while the entire collection is made as a collection of public moneys for public use by a public officer discharging his prescribed statutory official duty in so doing, unless there be some plain mandate of the law providing that such portion of this public money shall become private property. It is likewise plain that the legislature never intended the county superintendent should extract $2 for every applicant for teachers' certificate, that one half thereof should be public money and one half a private fund for the already salaried official at the head of the educational department of the state, upon whom already rested the duty of performance of all the duties of his office the legislature might declare belonged to it. Again, in case of default by the county superintendent of schools in making collection of

the applicants, would there be any doubt as to his liability on his bond for such failure of performance of plain duty, and who but the state would then be able to collect thereon? Or, again, in case of the collection of the $2 required and the embezzlement by the county superintendent of one half of such fund so collected, after the other one half had been paid into the county institute fund, would there be any question of the ability of the state to recover for its use the defalcation, or prosecute the delinquent officer criminally therefor? It is noticeable that the statute designates the total payment as a fee in the direction "and $1 of said fee shall be used by the superintendent of public instruction for such clerical assistance as he may deem necessary and competent." The fee of $2, then, is by statute designated as an entire payment, one fee, and, so regarded, it must be either wholly private or wholly public, unless the statute itself expressly declares one part public and the other private. One half the fee reaching by statute a public county fund, it thereby impressed the whole fund as belonging to the public, even though there be no provision made for the other one half, except that it be paid into the hands of the public official for public use. Hence, the conclusion urged by defendant that the omission to declare that portion of the payment transmitted to the state superintendent to be a public fund, while the other portion remaining in the county is declared a county fund, shows a legislative intent that the part transmitted to the state superintendent should be private funds, is without force. The only reasonable conclusion to arrive at is exactly the contrary; namely, that the legislature, having designated the portion remaining shall be turned into a particular fund, evidences an intent that the entire collection is for public purposes unless the contrary is specifically provided for, and it is not. This is strengthened by the presumption that every fee exacted by a public officer in the performance of his duty requiring it is a collection of public moneys excepting where the statute plainly provides that the officer shall be paid by the fee or that such fee collected shall belong to the officer. Otherwise it attaches as a public fee or profit of the office and belongs to the public. Defendant's assumption, then, that the statute authorizes the collection of these fees by these public officers, the various county superintendents, for the benefit of the state superintendent individually, is begging the question and assuming as a fact an unusual situation,

as nowhere and at no place is a similar provision found relative to a state or county officer. And such an assumption would ignore the proposition of law that the burden in this case is upon the defendant to justify his title to these funds retained by him, and not upon the state, after the collection has once been established or admitted, to prove the ownership of moneys collected by force of statute by public officers, transmitted to the incumbent of this state office.

Then, again, the statute providing for the payment of fees by private parties to public officers necessarily evidences a legislative intent that such fees shall belong to the public, unless expressly declared as fees to the officer individually; and most certainly is this true where the officer to whom the fees are paid is a salaried officer. Defendant, challenging the conclusion that the fees are a public fund, argues that the various county superintendents are the agents of the state superintendent to collect from each applicant for a teacher's certificate the $1 item on behalf of the state official; and urge that he is an agent or trustee in such collection and the transaction of the same to the state superintendent, urging this agency or trusteeship as a reason why the funds should be held to be the private property of the superintendent from the time of their collection. But though the county officer may act as agent or trustee of the incumbent of the office of state superintendent of public instruction in the performance of this duty, it does not follow that such is any reason to characterize the fund so acted upon as a private fund, when one remembers that every public officer is an agent for the state and likewise a trustee for the state in the performance of his duty. Turn to § 3, Throop on Public Officers, and find the following definition of a public officer: "A public office is an agency for the state, and the person whose duty it is to perform this agency is a public officer." Turn again to Mechem on Public Officers, § 803, and read: "From the very nature of the case it is evident that the public—the government, be it national, state, or lesser municipal— can deal with third persons and enter into contracts with them only through the instrumentality of its public officers or agents, duly authorized by law and acting within the scope of the authority conferred upon them." See also §§ 839 and 840 of the same authority. And constantly throughout the text-books and decisions on public officers we find parallels drawn, comparing public officers with agents and trus-

tees, and the word "officer" is often used, coupled with agent or trustee, in illustrating the relation between the office and the public. A public officer is in a sense an agent or trustee of every other public officer or person to whom a responsibility is owing by the public officer. And whether the fees in question be the property of the state or the property of the defendant, the county superintendent in the collection of the fund in either case acts as an agent or trustee for such purposes.

Again, it is urged in support of the contention that these funds are private funds of the officer that the state has in no sense obligated itself to pay any clerical assistants he may employ, but on the contrary, that the superintendent is alone responsible for their pay; and that he has the fund and is required to procure the work done on his own private responsibility. We submit this proposition will not stand the light of reason. Here is a state officer explicitly authorized by the statute, § 869, in the closing part thereof, to employ such clerical assistants as he may deem necessary and competent. For whom is the employment but the state? Who pays the employees but the state? And from what is it paid but the fund mentioned in § 876, which fund is by statute limited to the disbursement for payment of such clerical assistants as must be necessary as well as competent to do the work? If a private fund, why such limitation on its disbursement? Are private funds subject to statutory limitation? Does not, on the contrary, reason dictate that such statutory restriction evidences a legislative intent that the fund was a public one? The importance of this question of ownership of the fund is seen when we realize that, to sustain defendant's contention, we must hold that the fund, from collection to final disbursement, at all times remains private property of an incumbent of public office; and to so hold it would follow as the night the day that at no time has the state been responsible for the payment of the employees doing its work under the statute authorizing the state superintendent to employ clerical assistance. We cannot subscribe to such a doctrine contrary to all precedent and as inconsistent as it is unreasonable. The statute, by authorizing the officer to employ clerical assistants in his office to perform and assist in the performance of the duties of the officer, never contemplated that when so employed they should be regarded as private servants looking to a private individual for their compensation. While the clerks are not officers, not

having subscribed to any oath of office, or given a bond, or being responsible as public officers, yet they are public employees when legally employed by the officer authorized by law to engage their service, in the absence of some provision of law or some express provision of their contract of employment rendering the public officer personally liable to them for their pay, and accordingly the state is their paymaster and legally obligated as such to pay them. In the absence of any statutory or contract provision as to who shall pay such clerical assistants, the presumption is that the officer when authorized to make the employment at all bound the state, and not himself, to pay the employee. See chap. 7, Mechem on Public Officers, and particularly § 805 thereof, reading: "A well-defined distinction is made by the law between contracts entered into by the agent of a private principal and those of the agents of the public. It is constantly presumed that the latter do not intend personally to assume the public burdens, and that persons dealing with them do not rely upon their individual responsibility. 'On the contrary,' says Judge Story, 'the natural presumption in such cases is that the contract was made upon the credit and responsibility of the government itself, as possessing an entire ability to fulfil all its just contracts far beyond that of any private man, and that it is ready to fulfil them not only with good faith, but with punctilious promptitude and in a spirit of liberal courtesy.' " Then, again, § 806, same authority, reads: "Hence it is well settled as a general rule that public officers and agents will not be held personally liable upon contracts entered into by them in the public behalf, except in those cases where the intent is clearly apparent so to bind them. And as is said by Chief Justice Marshall, 'the intent of the officer to bind himself personally must be very apparent indeed to induce such a construction of the contract.' " Then, again, we quote the following from Throop on Public Officers, § 551: "A contract entered into in behalf of the state by public officers empowered by statute, either expressly or by implication, to make the same, binds the state as a contract by an individual made through his authorized agent binds him."

Nor are works on public officers the only text-books supporting this proposition. See chap. 37 of second edition, Bishop on Contracts. We quote from § 996 of this authority the following summary of the chapter: "The government, whether of the United States or of a

state, has within its sphere the same power of contract as an individual within his sphere. And like an individual it can enforce the contract in its courts. It is bound the same on its part and the presumption is the same that it will perform. . . . Since it can act only through its officers and other agents its contracts must be ostensibly made by them, for which and other reasons the presumption is always strong that it, and not the agent, is the party to a bargain in its interest."

Under these authorities, but a digest of the cases cited in them, it is plain that the state, and not the defendant, is the employer and paymaster of any clerical assistants contemplated to be employed by the superintendent of public instruction under §§ 869 and 876 of the statute. It is equally plain that the fund from which such help shall be paid is, as declared by § 869, the accumulation from the portion of these fees in the hands of the superintendent. The state being the employer and the party responsible to the employees for wages, the fund from which the wages are designated to come must be a public fund. There can be no other conclusion in reason. And if the fund is a public fund at the time of its prescribed statutory disbursement, it is such in its collection and transmission to the official and in his custodianship of it; all of which everlastingly negatives the theory advanced by the defendant that the fund is his, and not a public fund.

We have established, then, that the undeniable, indisputable, basic fact confronts us in this inquiry, that we are dealing with public moneys in the hands of public officers accountable to the state for the proper care and keeping as well as the appropriate disbursement of public money collected for the state's use. With this in mind should we not have a plain direction in law before we should hold public moneys could be legally diverted as an increase in salary? And should not the claimant be able, before establishing title to the fund, to place before us legislative sanction for such appropriation? With the ownership of the fund established to be in the state, let us analyze the statute in question under which defendant makes his claim thereto. The statute reads: "It shall be the duty of the county superintendent immediately after each examination to forward $1 for each applicant for teacher's certificate to the superintendent of public instruction, such sums to be used by him as hereinbefore provided." This is the law covering the payment of the fund into his hands, "to be used by him as

23 N. D.—6.

hereinbefore provided," which is in the manner prescribed in the following language: "And $1 of said fee shall be used by the superintendent of public instruction for such clerical assistance as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith." No other authority whatever is granted him to disburse from this fund, except it be contained in the last part of § 869, reading: "He may appoint such clerical assistants as he may deem necessary, but the expenditures therefor shall not exceed in the aggregate the sum annually collected from applicants for county certificates for this purpose." It is true this particular state does not expressly require the superintendent to account for the fund in question, nor does it say what disposition he shall make of any balance of the fund remaining unexpended; but that does not alter the fact that whatever balance exists remains as a balance of a public fund. Nor can the fund be disbursed by the superintendent of public instruction except for certain specified purposes. The statute defines the purpose of the fund's collection to be to pay clerical assistants in the office of the state superintendent of public instruction, and defray expenses of assistance in examination, marking and filing of teachers' answer papers, authorizing the superintendent to use said fund not for general clerical assistance, but "for such clerical assistance as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith." With the examination papers being examined by the various county superintendents, no such fund was contemplated or provided for, but immediately on this work being thrown into the department of public instruction with the bill placing the work there, we find this fund created, to use the words of the statute, "for this purpose" of defraying the expenses necessarily to be incurred "for such clerical assistance as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith." And, again, immediately following in the provision for payment by the county superintendent to the state superintendent, we find the command; "To forward $1 for each applicant for teachers' certificate to the superintendent of public instruction, such sums to be used by him as hereinbefore provided," again limiting its disbursement to the particular use to which it is ordered applied. But defendant contends it was intended by the legislature that he should

own the fund, subject, however, to the duty of payment therefrom of such clerical assistance as should be necessary to properly perform the duties of the office in this respect. Such is not the letter nor the intent of the act. So to do would be contrary to all precedent in the payment by the state of its officers. Was not the clerical force "necessary and competent for the reading of teachers' answer papers and the work connected therewith" in the state's employ? When has the state ever provided a fund to pay its employees, and transferred title to the same to one of its officers under the command that he individually be responsible for and pay such clerical help of the state? History affords no example of such a manner of dealing by this state. Why should the state exercise the foresight to collect the adequate fund to more than meet all expenses, and then place it in the hands of the officer under whose supervision the work is to be done as a gift to him individually, instead of acting as reason would demand, that of placing the fund in the officer's hands and authorizing him to disburse it as the state paymaster to the employees of his office working for the state. Most assuredly it would seem that before such an unreasonable, unprecedented procedure is declared to be that intended, the statute should be so plain as not only to imperatively demand such construction, but negative any other reasonable one.

The statute grants no more than the right to use, meaning the right to disburse, expend, and pay out the money for the declared purpose for which it was provided. Surely if a construction is adopted interpreting legislative permission to use under such circumstances as an appropriation and a grant of ownership to the officer, careful, indeed, must future legislatures be; and to prevent state officers from claiming funds coming to them by virtue of office, future legislation, to properly safeguard the interests of the state in authorizing official disbursements, should always conclude with a statement "that under no circumstances shall the officer be held to own the public funds hereby intrusted to him by virtue of his office for the state's use." The idea of the necessity for such a provision shows the absurd extreme to which a holding with appellant would naturally lead. Rather, instead, the contrary construction should prevail, that the public official who retains possession of public funds under claim of ownership thereof should be able to base his claim on plain and unambiguous statutory authority therefor; upon

such a definite, unequivocal appropriation to him of the fund as evidences a plain legislative intent to make him the donee of public property. The legislature by granting the use granted no more than that, and the right to such use was granted, not to the individual, but to the office as an incident of the office. We have searched without success for precedent favoring defendant's contention. None is cited by his careful, painstaking, and eminent counsel. On the contrary we find the words "use" and "to be used" must be construed with the context. As an instance, such terms in insurance law mean occupancy; in real estate transfers and the interpretation of wills and devises, the word "use" often is interpreted as a trust; while in ordinary language to "use" is to employ, to derive service from; to "use" moneys is to pay out or disburse them. In Hightower v. State, 72 Ga. 482, the term is exemplified as "one may 'use' a thing that is employed in his service or business." Again, in Heaston v. Randolph County, 20 Ind. 398, at page 403, we read: "The word 'use' may be held as synonymous with benefit." Again, under statutes regulating United States customs duties on personal property imported, in Astor v. Merritt, 111 U. S. 202, 28 L. ed. 401, 4 Sup. Ct. Rep. 413, we find: "In 'use' is defined to be in employment." "Out of 'use' is defined as 'not in employment.'" "To make use of is defined as 'to put in use,' 'to employ,' 'to derive benefit from.'" Again, in State v. Davis, 9 Houst. (Del.) 558, 33 Atl. 439, at page 440, the opinion used the following language: "The word 'use' means to make use of, to convert to one's own service, to avail one's self of, to employ, to put to a purpose." Again, in State ex rel. Hayes v. Board of Equalization, 16 S. D. 219, 92 N. W. 16, we read from the opinion that "use and ownership are not synonymous." Courts are often called upon in taxation matters to determine whether the use or the ownership determines exemption or nonexemption on property for taxation purposes. In Washburn College v. Shawnee County, 8 Kan. 344, we read: "It is strictly the use of the property which determines whether the property is exempt or not." Again, in Cincinnati College v. State, 19 Ohio, 110, in the discussion of taxation matters, we find the following: Property used exclusively for educational purposes is exempt whoever may own it or whoever may use it. Property not used exclusively for educational purposes, if otherwise taxable, is not exempt whoever may own it or whoever may use it. And

generally in taxation matters the use instead of the ownership determines the right to tax, so far as the exemption from taxation of property used for charitable purposes is concerned. We find the right to use to be but an incident of ownership, but not necessarily implying ownership. In no sense are the terms "use" and "ownership" synonymous, nor to be construed as identical in meaning. If the statute in question had authorized the "use" by him for educational purposes of certain real estate belonging to the state no one would contend that more than the bare power to use was conferred. Why under the same phraseology should the privilege of use of public moneys for a specified purpose carry with it the ownership of the fund? The power to employ, to disburse, to pay out, to put to a purpose, or to derive benefit from the money—terms held synonymous with use,—must be construed in connection with the fact that such employment, use, and benefit derived is for the state in whose behalf such funds are to be used, disbursed, and employed.

Appellants urge for our consideration an assumption that the legislature never intended that any balance should exist in this fund. It matters not whether it did or not. Assume the legislature may have supposed that the entire fund would be consumed for the purposes specified and to which the fund is required to be devoted,—to the payment of clerical help. The supposition of the legislature in this respect in no wise evidences an intent that the superintendent of public instruction personally should derive any benefit, but rather the contrary, if the supposition be true, it evidences a want of intent on the part of the legislature to transfer ownership of the fund to the superintendent. It certainly is irrational to first suppose an intent that no balance shall exist, and in the next supposition suppose therefrom such evidences an intent that a balance shall exist and that it shall be the private emolument of office of the officer. Unless the legislature assumed the fund to be entirely devoted to and consumed as well in paying state office employees in clerical work, why the provision that the expenditures for the purposes to which the fund is to be devoted shall not exceed the aggregate sum annually collected from applicants for county certificates for this purpose? The intent may have been that the state clerical help would perhaps consume entirely the state's fund provided to pay the same. If so, this very idea negatives the thought

of its appropriation by the state superintendent, to alleviate whose work and make possible payment of clerical assistants without calling on the general funds of the state, this special fund was created. Grant, again, that a fair inference from the provisions of § 869 is that the fund was to be used to pay clerical assistants so far as it would go, and that the state superintendent and his deputy should, in case of work remaining unfinished in "the reading of teachers' answer papers and work connected therewith," complete the same as a duty of his office. Inasmuch as no specific provision is made for such added work, if any was thrown upon the office, no added salary was to be paid defendant therefor; the rule in such case being that if the statute increases the duties of an official by the addition of other duties germane to his office, he must perform them without extra compensation. "An officer who accepts an office to which a fixed salary or compensation is attached is deemed to undertake to perform its duties for the salary or compensation fixed, though it may be inadequate, and if the proper authorities increase its duties by the addition of others germane to the office the officer must perform them without extra compensation. Neither can he recover extra compensation for incidental or collateral services which properly belong to and form a part of the main office." Mechem, Pub. Off. § 862; Throop, Pub. Off. 478, 479; 1 Dill Mun. Corp. 4th ed. § 233; Evans v. Trenton, 24 N. J. L. 764; People ex rel. Phœnix v. New York, 1 Hill, 362; Andrews v. United States, 2 Story, 202, Fed. Cas. No. 381; United States v. King, 147 U. S. 676, 37 L. ed. 328, 13 Sup. Ct. Rep. 439; Broaddus v. Pawnee County, 16 Okla. 473, 88 Pac. 250. "A change in the duties of an office during the term of the incumbent does not affect the compensation of the officer." 29 Cyc. 1424, citing: Bennett v. Orange, 69 N. J. L. 176, 54 Atl. 249, affirmed in 69 N. J. L. 675, 56 Atl. 1131; Tyrrell v. New York, 159 N. Y. 239, 53 N. E. 1111; Marquis v. Santa Ana, 103 Cal. 661, 37 Pac. 650; State ex rel. Watson v. Eskew, 64 Neb. 600, 90 N. W. 629; Sidway v. South Park, 120 Ill. 496, 11 N. E. 852; Locke v. Central, 4 Colo. 65, 34 Am. Rep. 66; People ex rel. Stetson v. Calhoun County, 36 Mich. 10; Gerken v. Sibley County, 39 Minn. 433, 40 N. W. 508; Raymond v. Madison County, 5 Mont. 103, 2 Pac. 306. See also Stringer v. Franklin County, — Tex. Civ. App. —, 123 S. W. 1168, and Bohart v. Anderson, 24 Okla. 82, 103 Pac. 742, 20 Ann. Cas. 742.

"Public officers have no proprietory interest in their offices or any right of property in the prospective compensation attached thereto." State ex rel. Lull v. Frizzell, 31 Minn. 460, 18 N. W. 316–319; Cooley, Const. Lim. 7th ed. 388.

But on the question of the assumption by the legislature that no un-expended balance in this fund would ever arise, it is doubtful if such assumption is warranted. The findings show that a balance has been accumulated steadily during the entire incumbency of defendant in said office. At the expiration of the first two years in office a balance of $1,857 remained unexpended of this fund, which was increased by the next two-year term to a balance of $3,800 over all disbursements, and at the expiration of defendant's third term it has further increased to the amount in suit, $4,898. The legislature are presumed to have acted intelligently in this as in all legislation. They foresaw the necessity of creating the fund to care for the expense of clerical assistance. It is but reasonable to suppose investigation was made in advance of the leg-islation as to whether the fund would be ample to care for the expense for which it was created, and the fact that it was more than sufficient, as the existence of this suit establishes, should but strengthen the belief in the care with which this legislation was enacted. Can we not con-clude then that the legislature intended just what has happened? That a balance should remain, but if perchance the fund should not be sufficient there should be no drain upon the state treasury or its accu-mulation from other sources? Such a construction is more reasonable than the contrary one that, because of the provision against expending more than the amount collected by this fund in clerical help, the entire fund itself was to be donated to the incumbent of the office to the detri-ment of the state financially, the construction urged by the defendant in this action.

Much stress is laid by defendant upon the fact found by the trial court to exist, that this balance in suit remains unexpended largely be-cause he as an officer performed himself the duties and work resulting from examining, marking, and filing teachers' answer papers and other work connected therewith, instead of employing clerical assistance in the performance of the work and expending the fund in payment there-for. Any economic action of the officer in such respect is commendable, but the declaration of the statute still remains that this money is to be

used by him only for clerical assistance necessary in the **performance** of these certain duties; and also that the duties were not imposed upon the defendant individually but upon the office. His work in the performance of his official duty is that of the incumbent of the office. It is not clerical assistance, and cannot be so construed. His time and the result of his energies belonged to the state, so far at least as the state's necessity required. And as such officer he was obliged to so properly fulfil the duties of the office, and for these he is paid his yearly salary. While economic administration in office is to be commended, yet it is but a duty to be expected, and not something to furnish a pretext for the appropriation of clerical hire graciously provided by the state to lighten the work of the office. The very claim of the defendant establishes the fact of his ability to do the work himself and save the fund, and the want of necessity for its disbursement, leaving the fund belonging to the state unexpended; certainly the want of the necessity for its use so established can in no wise change the character of the fund from state moneys to private emoluments in office. "Since a public officer with fixed compensation is bound to perform his duties for the compensation provided by law, compensation in addition to salary must be expressly provided for." 12 Current Law, p. 1160, and cases cited. Again, "Public officers must perform the duties of their offices, however onerous they may be, for the compensation fixed by law, and will not be allowed compensation for extra services unless expressly authorized by statute." 4 Current Law, 865, and cases cited.

As to the claim of the defendant regarding which findings were made in the trial court as to some of the work being done out of regular office hours by himself individually, and that because of such efforts he is entitled to the amount so saved from the fund as his personal compensation, plenty of precedent exists against the validity of such a claim and none for it. See Morgan v. New York, 105 App. Div. 425, 94 N. Y. Supp. 175, the syllabus of the case summarizing the holding to be: "The fact that affidavits taken by a chief messenger in the department of buildings of the city of New York in the performance of his duties as such messenger, as charged on him by specific direction, were taken in the morning before business hours, did not entitle him to extra compensation," citing McCabe v. New York, 77 App. Div. 637, 79 N. Y. Supp. 176, affirmed by court of appeals in 176 N. Y. 587, 68 N. E.

1119; in which case it is held that an employee of the city is not entitled to extra compensation for services performed, out of regular office hours.

As further illustrating and supporting this proposition, see McBrian v. Nation, 78 Kan. 665, 97 Pac. 798, where a chaplain of the penitentiary, required by statute to devote his entire time to the performance of his official duties as such, and paid $1,000 per year therefor, superintended a night prison school after employment by the board of directors of the penitentiary so to do, and was refused a reasonable compensation of $30 per month for such additional service. In disposing of the case the court says: "The case here presented is an extreme one. The services as superintendent of the night school are performed when the chaplain would probably not be engaged in any official duty. No material injury is suffered by the state. Moreover the chaplain would seem to be an eminently proper person for a superintendent of the school, and his services are less expensive than if a specially qualified person were employed to perform them. Strictly speaking, however, the time so devoted by the chaplain belongs to the state and is paid for by his salary, and this is a sufficient reason why the state should not be called upon for further payment." And payment was denied. Granting the case on trial to be an extreme one so far as personal effort of the defendant expended for the benefit of the state in saving the fund is concerned, it is not as extreme an instance as the Kansas case quoted. Defendant is paid a more adequate salary, every personal expense provided for connected with the office, and he was under no employment by anyone pretending to exercise authority to induce him to do the work, granting that it was all done after hours, as was the case in McBrian v. Nation.

Another ground for defendant's claim of ownership of this fund is that the statute creating it does not require the superintendent to account to the state for the proceeds hereof, and that in the absence of such an accounting the right to use conferred carried with it by necessary implication the ownership of the fund itself. Further, that he is not chargeable with an accounting, and that the omission of express statutory requirement that he shall account evidences an intent that he shall not and that the money shall belong to him. To this we cannot agree. The public officer is an agent or a trustee of the public, and he must ac-

count for all money coming into his hands by virtue of his official relation to the public, and this *without the necessity of a statute requiring him to account.* His bond to the state as its officer, required by the provisions of §§ 401, 403, and 404 of the Code of 1905, existing by virtue of legislative enactment prior to the taking office of this incumbent, requiring his bond in the penal sum of $5,000, conditioned that such officer "render a true account of all moneys and property of every kind that shall come into his hands as such officer, to pay over and deliver the same according to law," is in itself a contract with the state that on his bond he will account for these moneys. But defendant may answer and say that the bond only calls for the payment to the state of the money required to be paid to it by law. The requirement of §. 401 Code of 1905, formerly contained in Revised Codes of 1899 at § 340, is that the requirement of the bond shall be that he "shall account according to law," and the law makes it his duty to account as a trustee to the public at the termination of his term of office for all moneys and property received by him in his capacity as public officer. For authority for this holding, see § 909, Mechem on Public Officers, reading: "It is the duty of the public officer, like any other agent or trustee, although not declared by express statute, to faithfully account for and pay over to the proper authorities all moneys which may come into his hands upon the public account, and the performance of this duty may be enforced by proper actions against the officer himself or against those who have become sureties for the faithful discharge of his duties." Then, again, quoting from the same authority, § 912: "It is made the duty of the officer either by the terms of the statute prescribing his duties, the performance of which the bond in general terms is given to secure, or by the very language of the bond itself, to safely keep the public funds which come into his hands and to pay them over according to law," and "the officer's liability is, according to the great majority of the decisions, held to be fixed by the terms of the statutes, or the language of the bond," to the terms of which bond he has given the state he is held. As to the time at which the defendant was called to account, § 910, Mechem on Public Officers, announced the following rule: "Where by the law creating the office or otherwise the time for accounting is expressly fixed that provision would of course govern. Where, however, no such time has been fixed it would be the duty of

the officer ordinarily in analogy with that of a private agent to account upon lawful demand, and at all events, within a reasonable time." Sec. 916, Mechem on Public Officers, in part reads: "It is frequently the case that public officers, by virtue of their position, come into the possession of property, both real and personal, belonging to the public. Certain of this property, such as real estate occupied for public purposes, and the public books, records, and furnishings, form permanent appurtenances of the office designed by law to be transmitted to his successor, and it is the officer's duty therefore upon the expiration of his term to duly deliver them over to the public authority lawfully entitled to receive them."

In this case the fund in question came to defendant as an incident of his office, as much so as an appurtenance of the office, and, in the absence of statute, the law implies the plain duty that he shall deliver them to his successor at the end of his term, and in so doing there necessarily exists the obligation to account for such money and for the accuracy of his books regarding the same, as well as the requirement of its safe-keeping. It matters not that the legislature omits to specifically require an accounting. His bond required by law is that he shall so account; and the law requiring his custody of this public fund, the terms of his bond, and the law authorizing it, compel an accounting thereof. Appellant's contention in such respect is as untenable as would be that, because the statute defining his duties does not specifically require him to perform them to the best of his ability, or does not in terms require him to be faithful and honest toward the public, that indifferent official action or unfaithfulness or dishonesty toward the public would be excused as not mentioned in the statute or "not so nominated in the bond." We use this illustration with no reference to appellant personally, his efficiency in office being unquestioned, and realizing that his claims in suit are made by him in the utmost of good faith.

But in the contention of defendant that nowhere in the statute is he obliged to account, defendant overlooks the plain mandate of the statute requiring him to account on demand of the state auditor, imposed upon the state auditor as the duty necessarily a part of the duties of that office, of formulating an account with the office of superintendent of public instruction, and, if necessary,

compelling an accounting. See § 103, Revised Codes of 1905, formerly existing as § 100 of the Revised Codes of 1895, reading: "Whenever any person has received moneys or has moneys or other personal property which belongs to the state by escheat or otherwise, or has been intrusted with the collection, management, or disbursement of any moneys, bonds, or interest accruing therefrom belonging to or held in trust by the state, and fails to render an account thereof to and make settlement with the state auditor within the time prescribed by law, or when no particular time is specified, fails to render such account and make such settlement, or who fails to pay into the state treasury any money belonging to the state upon being required so to do by the state auditor within twenty days after such request, the state auditor must state an account with such person charging interest at the rate of 12 per cent per annum from the time of the failure." Also by § 101 of the Codes of 1905, in existence prior to the time of taking office of the defendant as § 98, Revised Codes of 1905, we find the duties of the state auditor defined and itemized, and therein we find: "It is the duty of the state auditor: . . . 11. To examine and settle the accounts of all persons indebted to the state and certify the amount to the treasurer, and, upon presentation and filing of the treasurer's receipts therefor, to give such person a release, and charge the treasurer with such amount. . . . 13. To require all persons who have received any moneys belonging to the state and who have not accounted therefor to settle their accounts. . . . 15. To require at such times and in such forms as he may designate all persons who have received money or securities, or who have had the disposition or management of any property of the state of which an account is kept in his office, to render statements thereof to him, and all such persons must render such statements when so required by said auditor. 16. To direct and superintend the collection of all moneys due the state, and institute suits in the name of the state for all official delinquencies in relation to the assessment, collection, and payment of the revenue, and against persons who by any means have become possessed of public moneys or property and who fail or neglect to pay for or deliver the same and against all persons indebted to the state." Surely these duties of the auditor plainly provide he shall require an accounting of this state fund in the hands of this state officer. Then again, § 421 of the Codes

of 1905, existing since the Revised Codes of 1899 as § 358 thereof, prior to the taking of office of appellant, must also apply as a specific legislative provision requiring him to account. Sec. 421 reads: "Every officer elected or appointed under the laws of this state shall, on going out of office, deliver to his successor in office all public moneys, books, records, accounts, papers, documents, and property in his possession belonging or appertaining to such office." For fear that this section should not be construed to cover officers re-elected to the same office, careful legislative provision is made in § 420, Codes of 1905, formerly existing as § 358, Revised Codes of 1899, reading: "When the incumbent of any office is re-elected he shall qualify as above required, but his bond shall not be approved until he has produced and fully accounted for all public funds and property in his control under color of his office during the expiring term, to the person or authority to whom he should account, and the fact and date of such satisfactory exhibit shall be indorsed upon the new bond before its approval." Certainly this provision, construed with the provisions above quoted as to the duties of the state auditor, make it plain that before defendant properly qualified at the commencement of his second term of office, in law it was his duty to account for the $1,857 remaining unexpended of this fund, and before his last qualification the law imposed the duty to likewise account for $3,800, and this, regardless of the provisions of § 103, making it the duty of the state auditor to see that he did so account.

These statutes are general ones, applying where no specific, express contrary provision is made. The legislature placed this fund as it did "for his use" to be expended "for clerical assistance necessary and competent" to do the work specifically required; and the reason why such statute did not in terms provide an accounting, or require the money to be turned into the state treasury at the end of each of his terms in office, was because the fund was created and placed in his custody under this general statute requiring such accounting, rendering unnecessary any specific legislation on the subject. Assuredly when the legislative power places a fund in the hands of a state officer as a trustee of the fund, with such plain statutory requirements existing as to the officer's duty to account, the obligation arising from the general statute applies as certainly as though an accounting has been especially

provided in the legislation creating the fund. Notice, also, that the provisions of these sections are so general as to cover every emergency and all public funds and property in the officer's possession or control under color of his office. It surely was the legislative design to cover every dollar reaching a public officer from any source whatever not otherwise excepted, or for which no other certain specific provision was provided. This general language itself heads off any claim that defendant became the owner of this fund in question, as it certainly came to the office of which he was the incumbent as an incident to such office, and he himself secured possession thereof under color of that office. The term "color of office," in this connection, cannot be distorted when read with the context, to mean a fund not legally belonging to the office, but obtained by the official wrongfully under color of office.

But we find that the legislature of 1901, creating this fund, defined in its creation its use to be that of paying for clerical assistance, the act itself providing by express terms its creation for that purpose. Not only did they declare the purpose to which it should be applied, but they did at the same session, under chap. 51, Session Laws 1901, and prior to the going into effect of the law creating the fund, provide it to be a misdemeanor for the officer to divert to his own use and benefit any allowance made for clerk hire in his office, by the following provision: "Any state or county officer who shall, either directly or indirectly, receive and appropriate to his own use and benefit any part of the allowance made for clerk hire in his said office shall be guilty of a misdemeanor." That legislature clearly understood there was a distinction between use of a fund for the public and use of it for the individual in office. In the face of this statute, how can it be maintained that, in granting the right to use this fund in question in such manner for such declared purpose, for clerk hire only, the legislative intent was to permit the appropriation of the fund or any part or balance thereof, the very thing guarded against by chap. 51, of the act quoted, enacted by the same legislature? Chap. 51, Session Laws of 1901, is still in force as § 8645, Codes of 1905.

Then, again, we must not lose sight of the common-law requirement in connection with salaries, that the statute must be plain and explicitly cover the salary or increase of salary claimed; for in the absence of statutory provision for compensation the officer is presumed to perform

the work gratuitously as a matter of honor. Mechem on Public Officers, §§ 855, 856; Throop on Public Officers, § 446, reading: "The general law is that the rendition of the services of a public officer is deemed to be gratuitous unless a compensation therefor is fixed by statute." "A strict construction of the statute under which the salary is claimed, against the person asserting the claim, must be followed." See 15 Decen. Dig. p. 732, and cases there cited, including Wood v. Madison County, 125 Ind. 270, 25 N. E. 188; Legler v. Paine, 147 Ind. 181, 45 N. E. 604; Torbert v. Hale County, 131 Ala. 143, 30 So. 453; State ex rel. Troll v. Brown, 146 Mo. 401, 47 S. W. 504; State ex rel. Linn County v. Adams, 172 Mo. 1, 72 S. W. 655; Bates v. St. Louis, 153 Mo. 18, 77 Am. St. Rep. 701, 54 S. W. 439; State ex rel. Axen v. Meserve, 58 Neb. 451, 78 N. W. 721; Bennett v. Orange, 69 N. J. L. 675, 56 Atl. 1131; State v. Allen, — Tenn. —, 46 S. W. 303; Dillon v. Whatcom County, 12 Wash. 391, 41 Pac. 174; State ex rel. Holman v. Roach, 123 Ind. 167, 24 N. E. 106. "Where the provision of law fixing the compensation is not clear it should be given the construction most favorable to the government." 29 Cyc. 1426, citing the following decisions fully sustaining the text: Tyrrell v. New York, 159 N. Y. 239, 53 N. E. 1111; United States v. Clough, 5 C. C. A. 140, 6 U. S. App. 377, 55 Fed. 373, an opinion by Circuit Judge Taft reversing 47 Fed. 791, and expressly disapproving the contrary doctrine laid down in McKinstry v. United States, 40 Fed. 813. See also State ex rel. Lull v. Frizzell, 31 Minn. 460, 18 N. W. 316; Bramlage v. Com. 113 Ky. 332, 68 S. W. 406; Gilbert v. Marshall County Justices, 18 B. Mon. 427; Morris v. Ocean Twp. 61 N. J. L. 12, 38 Atl. 760; State ex rel. Buttz v. Comptroller General, 9 S. C. 259; Cole v. White County, 32 Ark. 45. If this statute be of doubtful construction, then under the above authorities the doubt must be resolved in favor of the state and against the defendant. To hold with appellant would necessitate ignoring this rule in addition to giving an unusual and strained construction of the statute.

Another argument is advanced by defendant in support of his construction of the statute. He claims that the executive officers of the state, and legislatures as well, have acquiesced in such construction from the passage of the act in 1901 to the commencement of this action in 1910, and that this fact is entitled to weight in construing this state

.that he declares is ambiguous. Let us consider this proposition. Every incumbent of the office had before him the state and all the statutes of the state bearing on the question, including § 8645, against the appropriation of clerk hire by the officer. As to legislative sanction there is nothing showing that this particular matter has ever been called to the attention of the legislature. Instead we find practically every legislature increasing the expense allowed to the office and in doing so particularly designating how it shall be paid and for what it is payment. As an instance, the legislature in 1903, in chap. 192 of the Session Laws of that year, made an allowance of actual and necessary traveling expenses to the incumbent of this office, the same not to exceed $1,000, adding thereto its reasons in an emergency clause to the effect that the fund then allowed for such purposes was insufficient, hence the increase. Then the legislature in 1905 increased the clerk hire to $4,000 per annum, and made provision for the payment of a deputy out of the increase. The following legislature, in 1907, allowed the incumbent of the office an increase of $500 per annum for personal expenses as is shown by chap. 30 of the Session Laws of 1907, and this was increased by the next legislature by chap. 216, Session Laws of 1909, to $750 per annum for such purposes, the salary in the meantime having been increased to $3,000 per year, and the last legislature in chap. 266, Session Laws of 1911, fixed the traveling expenses at $1,200 per annum.

On the question of the practical construction adopted by the office and executive officers of the state favoring appellant's contention: The rule is that, before resort can be had to such a rule of construction, the statute must be ambiguous and of doubtful import as to its true meaning. "If the meaning of a statute is clear and unambiguous, a practical construction inconsistent with that meaning will have no weight, and will not be followed." 2 Lewis's Sutherland, Stat. Constr. § 474, p. 891. Under ordinary interpretation of the language used in the statute, we agree with the state's contention that there is no ambiguity in the statute, and there can be no resort to usage to aid in its construction. Under the same authority at § 476 we find a further want of evidence of the legislative intent that this statute be construed as a grant of the fund, instead of the use thereof. "The contemporary and subsequent action of the legislature in reference to the

subject-matter has been accepted as controlling evidence of the intention of a particular act. Legislative construction of old laws has no judicial force, whether right or wrong the courts must determine the proper interpretation from the statutes themselves." We submit that the contemporary act of the same legislature in making it a crime for state officers to appropriate any part of the clerk hire allowed by the legislature to said office, may be "accepted as controlling evidence of the intention of the particular act" under construction. Again, referring to the acts of subsequent legislatures: Nearly every two years provision has been made defraying the personal expenses of the officer in traveling when performing his duties. His personal office hire allowance has constantly increased. Five hundred dollars per year has been granted him for personal expenses without his filing a statement thereof, and subsequently increased to $750 per annum. His salary has been increased $1,000, and he granted, as at present, the right to employ to an unlimited extent clerk hire in office. But running throughout all these provisions we find expressed in exact terms the purpose for which all money is given or to which it is required to be applied, and at no place in twenty years of legislation touching this office do we find any grant of fees to this office as a prerequisite of the office. Appellant urges that the duties of the office have steadily increased. Reference to the statutes shows the salary and clerk hire have accordingly kept pace with the increased duties. Well, indeed, has the legislature provided for this office. All of which is indicative that the legislative intent in providing this fund was, as expressed in §§ 869 and 876 of the Codes of 1905, to provide a fund to pay the clerical help rendered necessary by the new duties imposed, and intrust the disbursing of the fund in the state's behalf to this particular officer, instead of directing payment in the usual manner. The statute, having defined the purposes, we must take that as controlling the action of the general assembly at the time of its passage. Accordingly the rule of statutory construction announced in Lewis's Sutherland, Stat. Constr. § 490, applies, it being: "In construing an act of the general assembly such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the general assembly at the time of its passage." Was the beneficial purpose of the legislature in enacting this legislation to increase the

23 N. D.—7.

superintendent's annual income, or was it, as declared by the act, a provision for clerical assistance and to prescribe its payment out of the fund created therefor?  Again at § 916, Lewis's Sutherland, Statutory Construction, we find: "An act should be so construed as to bring it, if possible, within the legislative authority; to limit its general words to the subject-matter or object of the act."  Thus is the wording of the act limited to and to be read in the light of the subject-matter and the object of the act.  The object of this legislation being manifestly to create a public fund for a particular purpose and regulate its use, limiting it to such purpose, far-fetched indeed must be the course of reasoning whereby, contrary to all precedent and dealing with public officers, a construction be given as contended for by defendant.  Such an intent never could have been the controlling idea of the legislature.

One further contention demands consideration.  Were these fees received and to be disbursed by the state superintendent in the course of his required official duty?  The statute effectually answers in the affirmative.  Sec. 869 declares his duty with reference to teachers' answer papers that "he shall examine, mark, and file or cause to be examined, marked, and filed all answer papers submitted" by applicants for county teacher's certificates.  Sec. 873 makes the county superintendents the officials conducting the examinations for teachers' certificates, and provides that they shall forward all answer papers "immediately after the close of the examination to the superintendent of public instruction for examination, marking, filing, and recording. The superintendent of public instruction shall transmit, within thirty days from the date of said examination, a record of the standings of each applicant to the county superintendent, who shall then grant to the applicant a certificate of qualification," if the applicant is entitled thereto from said examination.  The questions used in the examination, § 751 declares it to be the duty of the state superintendent "to prepare or cause to be prepared."  Though the statute permits the superintendent to either do the work himself or cause it to be done, it still remains his duty to superintend such work and such duty is discharged either by doing it himself or causing the performance of the work. The duty is to do one or the other, or both, that the work may be done within the thirty-day period prescribed for its completion.  In this

connection the case of State ex rel. Newnham v. State Bd. of Education, 18 Nev. 173, 1 Pac. 844, is parallel. We quote from the court's opinion on page 180: "The board's duty is to prescribe and cause to be adopted a uniform series of text-books. The statute makes the last duty as imperative as the first. The complaint made in this case is that the board fails to cause the adoption of text-books by it prescribed. By prescribing a text-book simply the board's duties are only half done. It must also see that the prescribed book is adopted and thereafter for four years it cannot be changed. This is the sensible view of the statute. The law declares no means by which the board shall cause the adoption of text-books, but, the duty being enjoined, a power is given to use such reasonable means as are necessary for its proper performance. By a judicious exercise of this power the board need not experience much difficulty in performing their entire duty." The fact that in the statute the disjunctive, instead of the conjunctive, is used, makes no difference with the application of the law quoted. The duty is prescribed by statute, the power to employ and the power to pay for the performance of the duty is granted, and the remark regarding the exercise of the power by the board here applies.

The phrase "or cause to be examined," wherein the officer is enjoined to examine or cause to be examined the teachers' answer papers, is as regards official action the equivalent of the individual performance of it by the officer. See 2 Words & Phrases, p. 1012, and Burnham v. Aiken, 6 N. H. 306, on page 328, where the court says: "What is caused to be done is done."

Nor can it be contended that because in § 869 the words "he may appoint such clerical assistants as he may deem necessary" are framed in the permissive, that such officer does not owe a duty to the public in the performance of the work for which the money was received and disbursed. Or in other words, that it was his duty, or it was not, as he saw fit to elect as to the performance of this work. If this theory needs answer it is effectually met by the authorities. We quote from § 593, Mechem on Public Officers, as follows: "Authority to perform acts of public concern is often conferred in language which in form seems to be permissive only, leaving it to the option of the officer whether he will act or not, and the question arises whether the imposition of the authority creates an implied duty to exercise it." In

disposing of this matter the authority given cites Chancellor Kent's decision in Newburgh & C. Turnp. Road v. Miller, 5 Johns. Ch. 101, 9 Am. Dec. 274, and continues as follows: "The inference deducible from the various cases on this subject seems to be that where a public body or officer has been clothed by statute with power to do an act which concerns the public interest or the rights of third persons, the execution of the power may be insisted on as a duty, though the phraseology of the statute be permissive merely, and not peremptory." See also Cutler v. Howard, 9 Wis. 309, from page 312 of which we quote: "The cases fully establish the doctrine that when public corporations or officers are authorized to perform an act for others which benefits them, that then the corporations or officers are bound to perform the act. The power is given to them not for their own but for the benefit of those in whose behalf they are called upon to act, and such is presumed to be the legislative intent." The same rule is approved in § 460, Sutherland Statutory Construction, and in § 548, Throop on Public Officers. The interest of the public in the prescribed duties referred to of this state officer cannot be disputed. His duties affect the public in this as in the performance of all his duties prescribed by statute and owing to the public. Hence the above authority is directly applicable.

Appellant calls attention to the fact that a previous legislature, that of the year 1899, defeated a bill providing in part for the fund in question and for its payment into the state treasury and a particular scheme for its disbursement. He contends that the defeat of this measure, and the fact that two years thereafter a succeeding legislature passed the statute under construction, is entitled to consideration as evidence that the bill, as passed, was not intended to be as the one defeated; and accordingly that the one passed must be taken as a grant of the fund to the individual. This is peculiar reasoning to say the least. How the reason governing the legislature of 1899 in defeating the measure in question is to be arrived at is difficult to conceive. Again, how its reasons if ascertainable, could have influenced subsequent legislation is equally hard to determine. Again, the intent of the legislature is to be determined from the act itself. If defendant's position in this respect be law, careful indeed should the state be to preserve all its old defeated proposed bills, hundreds in

number every session, that mayhap they may at some future time be considered as a reason, perhaps controlling, for some legislation that does run the legislative gauntlet and come into existence as law. This proposition is well in line with the strange and strained construction necessary to permit defendant to prevail in this action.

This action came to this court on appeal and was of the files of this court on and prior to October, 1910, from a judgment entered in district court March 29, 1910. Since a decision hereof has been pending in this court, the last legislature has enacted chapter 266 of the Session Laws of 1911, which took effect last July 1st, expressly repealing the sections of the statute construed in this opinion, re-enacting them in substance, however, but expressly providing that all fees similar to these in controversy shall be paid into the state treasury. In this connection it is a well-known principle of law that a legislature is presumed to do no idle act, and that where a law is amended the former law when ambiguous should be construed in such a manner as to give force to the amendment, rather than that such amendment be held unnecessary. But this rule of construction cannot here apply. The sections of the Code of 1895 under construction are not amended but repealed by the 1911 Session Laws, which fact in itself renders the rule relative to amendments inapplicable. Besides, new offices are created, a board of examiners to do this work and new machinery accordingly provided, so that in no sense can the present law be considered an amendment merely of the 1893 statutes under discussion. And the rights of defendant under review in this court on appeal are as they were fixed in 1909 by virtue of the judgment appealed from; and legislative action since judgment entered can neither add to nor detract from the verity of the judgment questioned by appeal. Hence, whatever the purpose for the enactment of chapter 266 of the Session Laws of 1911, the same must be wholly immaterial and a matter with which we have no concern.

Heretofore in this opinion we have not mentioned § 84 of the Constitution. We consider that the balance in suit, consisting as it does of a sum remaining undisbursed after full application to the purposes provided by statute of a total collection from sources provided by statute to be covered by § 84 of the Constitution, and accordingly as fees or

profits of an office therein named, must be under the mandate of such provision in accordance with its terms "covered into the state treasury."

"We conclude therefore that the moneys in question are and always have been since their collection public moneys of the state, for which the defendant is obliged to account to the state; that the statutes under which defendant came into possession of and became charged with the custody of these funds gave him no personal interest in or to them; that the right to use conferred was only the right to disburse for the state's benefit in the payment of its employees who performed such service for the state under the supervision of the defendant as a state official; that the additional duties imposed upon such office does not imply or evidence a legislative intent that the compensation of the officer should be proportionately or at all increased, the salary being but an incident resulting from the holding of office and bearing no relation whatever to the amount of official duties devolving under the law upon the officer; that where the provisions of law fixing the compensation of the officer is not clear, it must be given the construction most favorable to the state; that the burden is upon the defendant to prove his title to the moneys in question, their collection by him while in office under color of office being admitted; and to establish title to such funds in the individual, he must establish an appropriation thereof to him by plain statute where the office is a salaried as distinguished from a fee office; that the construction given by heads of departments and executive officers of government cannot control in the interpretation of a statute contrary to its terms, nor change the rule of construction that the statute when ambiguous is to be construed in favor of, and not against, the government; that all of the time, as well as all of the services capable of being rendered performed by defendant while superintendent of public instruction, was compensated for by the annual salary paid him, and defendant is entitled to no extra allowance therefor and can make no claims in the nature of offset or counterclaim for the reasonable value of extra service performed by him under official duty of office as a defense to plaintiff's recovery in this action. That as regards official duty every statutory direction to the officer creates a duty on his part to comply therewith, and in contemplation of law no duty prescribed can be disregarded and the fund in question remained as a balance of a collection made of moneys in

the performance of statutory duties. Nor can the enforcement by the state by appropriate action to collect its money from its delinquent former official properly be held to be inequitable or unconscionable. The officer, when doubt exists as to his right to fees, gains no advantage as against the state by the conversion or appropriation to himself of fees or profits in office.

The judgment of the trial court is affirmed.

FISK and SPALDING, JJ., dissenting. MORGAN, Ch. J., concurs, and BURKE, J., concurs specially.

BURKE, J. (concurring). The majority opinion is, as far as it goes, entirely satisfactory to me. The reasons hereinafter set forth are to be additional ones only. The majority opinion has construed chapter 85 of the Session Laws of the year 1901, and holds that the said act did not give to the defendant any right to the funds in suit. They base their construction upon the language of the act, and show conclusively that it was not the legislative intent to give said funds to the defendant. With that result I agree; it seems absurd to say that the legislature intended the defendant to have the surplus funds when they did not expect there would be a surplus. They certainly did not intend to extort money from the teachers of the state to enrich the defendant or the state. The legislature did not realize the fact that $1 from each teacher applying for examination would amount to such large sums.

But the additional reason I have to offer why the said act of 1901 should receive the majority construction is this: *any other construction would render said act of 1901 repugnant to § 84 of the Constitution of North Dakota.* It being the duty of courts to give to a statute a construction that will render it constitutional, rather than a construction that will render the act unconstitutional, it appears to me as one of the strongest possible reasons in support of the majority opinion that the construction contended for by the defendant is clearly in defiance of our Constitution.

Section 84 of the Constitution of this state reads as follows:

"Until otherwise provided by law, the governor shall receive an annual salary of $3,000; the lieutenant governor shall receive an annual salary of $1,000; the secretary of state, auditor, treasurer, super-

intendent of public instruction, commissioner of insurance, commissioners of railroads, and attorney general shall each receive an annual salary of $2,000; the salary of the commissioner of agriculture and labor shall be as prescribed by law, but the salaries of any of the said officers shall not be increased or diminished during the period for which they shall have been elected, and all fees and profits arising from any of the said officers shall be covered into the state treasury."

The act of 1901, as stated in the majority opinion, transferred the duty of superintending the teachers' examination papers from the county to the state superintendent of schools. In part it reads: "The superintendent of public instruction shall prepare, or cause to be prepared, all questions for the examination of applicants for teachers' certificates, both county and state, and shall prescribe rules for the conduct of all examinations. He shall examine, mark, and file, or cause to be examined, marked, and filed, all answer papers submitted by candidates for first, second, and third grade county certificates." [Rev. Codes 1905, § 869.] The act further provides that an *additional* dollar per head should be collected from the teachers and forwarded to the state superintendent, to be "used by the superintendent of public instruction for such clerical assistance as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith."

The defendant was an occupant of the said office, and collected under the act of 1901 the sum of $17,714 from the teachers of the state. He claims to have expended the sum of $11,815 for necessary and competent clerical assistance. The balance remaining in his hands he claims as a private fund. The state claims it is such "fees and profits" as are contemplated by § 84 of the Constitution, and that it should be covered into the state treasury. The defendant's claim is that this surplus was given to him *by implication* in the said act of 1901. He does not claim there are any direct words in said act giving him the funds. In fact the quotation above is all of the act that pertains to the use of the said funds. It must also be kept in mind that the state is not asking for all of the moneys collected by the defendant. He has been allowed to disburse, without question, $11,815, possibly to members of his immediate family, without any auditing upon the part

of the state. He is asked to account only for the balance remaining in his hands.

Turning again to § 84 of our Constitution, we find the phrase "all fees and profits arising from any of the said offices shall be covered into the state treasury." Are the funds in suit "fees and profits of office" within the meaning of this language? It seems absolutely clear to me that they are. Looking into the decisions of our sister states for holdings under similar facts, we find them unanimous in holding that funds collected under very similar circumstances are *fees,* and must be covered into the treasury. To understand those holdings, it is necessary to remember certain facts, relative to our legislative and judicial history. When this country was new and the duties of officials were light, it was customary to allow to them fees, upon the theory, no doubt, that they should be thereby paid for the work actually done. Unexpected increases in the work often gave to an official a small fortune in fees. Sometimes the state or the county would bring suit against the official to recover some of the fees upon some excuse or other. The courts uniformly held that, *in the absence of statutes* requiring the official to turn over the fees of his office, he was entitled thereto as a personal compensation. The legislatures promptly took the hint, and laws were passed in most of the states placing all officials upon a salary basis and providing that all of the fees collected by the official should be turned into the treasurer. The cases mentioned above would of course be no longer authority, because the statutes now provide for the payment of all fees into the treasury; but oddly enough those cases are now cited to us as authority, and cited, I am informed, in one of the dissenting opinions. I refer to Henderson v. State, 96 Ind. 437; Gordon v. Lawrence County, 1 S. D. 31, 44 N. W. 1025; Bruce v. Dodge County, 20 Minn. 388, Gil. 339. However, no state having a statute of the import of § 84 of our Constitution has held otherwise than that the fees belonged to the county or state, under circumstances similar to the case at bar. For instance, Minnesota had held prior to the passage of such a statute that the fees belonged to the official (Bruce v. Dodge County, supra), but after the passage of a statute covering fees into the treasury, she held directly to the contrary. A clerk of court had furnished to subscribers a certain bulletin showing the title to actions commenced, judgments entered, and other

information gathered from his office and useful to banks, attorneys, and commercial agencies. The subscribers paid to the clerk a certain sum monthly agreed upon by themselves. The county claimed the said subscriptions were "fees" of the office, and should be turned into the treasury. The clerk claimed the money as a private fund. In fact the contention of the defendant in the Minnesota case was almost exactly like the claim of the defendant in the case at bar. Judge Lovely wrote the opinion of the court, holding squarely that the subscriptions were *fees,* and should be accounted for; he says: "The general intent of the act of 1891 [requiring fees to be covered into the treasury] is not obscure or in dispute here. . . . These fees were to be collected and paid into the county treasury. From this source the county derived a revenue taken from the clerk, but in lieu thereof he was to be paid a fixed salary. His perquisites from fees for official duties were ended; these belonged to the county. His salary took their place, and with this he had to be content." Hennepin County v. Dickey, 86 Minn. 331, 90 N. W. 775.

Pennsylvania had a statute similar to § 84 of our Constitution, requiring certain "fees" to be covered into the state treasury. The legislature later on passed a law providing that applicants for liquor licenses should pay a certain amount to the clerk of court to be used as "expenses" in connection therewith. The clerk refused to pay this money into the treasury, claiming, like the defendant in this case, that the funds were not "fees" of his office. The supreme court of Pennsylvania held against him, and say that the term "fees" is broad enough to cover any money received by him by virtue of his office. Com. v. Fry, 183 Pa. 32, 38 Atl. 417.

California passed an act providing, like our Constitution, that certain officials should cover all fees of office into the treasury. Later an act was passed providing that the county treasurer should be allowed a commission for collecting taxes for villages. A county treasurer refused to treat those *commissions* as fees, but like the defendant in our case claimed they were allowed to him as a private fund. Their supreme court held with the county, and said that the term "fees" was broad enough to include "commissions." Smith v. Dunn, 68 Cal. 54, 8 Pac. 625.

Missouri passed a statute similar to § 84 of our Constitution, and

under it the supreme court of that state held that where the legislature allowed him certain sums as "compensation" for extra work done by him, he must account for the same to the treasury. They say: "From this section it is plain the clerk must report all fees for all services rendered in his official character. . . . It is true that § 3207 speaks of compensation . . . while § 5009 speaks of fees, but the word 'fees,' as here used, includes the compensation mentioned in the other section." [Callaway County v. Henderson, 119 Mo. 39, 24 S. W. 437.]

Oklahoma likewise had a statute that, like our Constitution, required "fees" to be accounted for. Under its provisions a certain county judge was required by their supreme court to turn in an allowance made to him for acting as a town-site appraiser. Finley v. Territory, 12 Okla. 621, 73 Pac. 273.

Nebraska also had such a statute. The board of county commissioners of one of the counties hired the clerk of court to act as clerk for their board, and paid him for his services. The county insisted that those moneys were such fees as were intended to be turned into the county treasury, and the supreme court of that state so held. State ex rel. Wayne County v. Russell, 51 Neb. 778, 71 N. W. 785.

California has also held that it did not matter whether such moneys collected were illegally so collected, yet the officer must account to the treasury, and the rightful owner could then sue the state. People v. Hamilton, 103 Cal. 488, 37 Pac. 627. Similar holdings will be found in the following cases: State ex rel. Frontier County v. Kelly, 30 Neb. 574, 46 N. W. 714; Hazlett v. Holt County, 51 Neb. 716, 71 N. W. 717; State ex rel. Buffalo County v. Allen, 23 Neb. 451, 36 N. W. 756; State ex rel. Miller v. Sovereign, 17 Neb. 173, 22 N. W. 353; Stoner v. Keith County, 48 Neb. 279, 67 N. W. 311; State ex rel. Lancaster County v. Silver, 9 Neb. 88, 2 N. W. 215; Crawford v. Bradford, 23 Fla. 404, 2 So. 782; St. Louis v. Meintz, 107 Mo. 611, 18 S. W. 30; United States v. Hill, 120 U. S. 169, 30 L. ed. 627, 7 Sup. Ct. Rep. 510; 3 Words & Phrases, title Fees, p. 2712.

In view of the above decisions, and considering also that in all of the above states the statutes only required the official to turn over "fees," while our Constitution requires that fees and profits be covered into the treasury, I think it clear that such part of the funds as

remained in the defendant's hands after he had paid all necessary and competent clerical assistance were fees and profits arising from his office and as such come under the terms of said § 84 of the Constitution. In passing we might say that there are a few cases that might be mentioned wherein certain moneys were received by the official by virtue of some *other office* he held at the same time, and those the state could not take. For example, if the defendant herein had been a notary public, and had received fees as such, those fees would not have arisen from his office as school superintendent. The same would be true had he been holding the office as city alderman, or as a director of a district or city school and had collected fees for his services. However, as to all fees collected by virtue of his occupancy of the office of superintendent of public instruction he must account.

Having decided that the funds in litigation are fees and profits within the purview of § 84, aforesaid, we next consider whether or not the legislature had the right, if they so desired, to give these fees to the defendant. Turning again to the constitutional provision, we find the phrase, "until otherwise provided by law," as the opening of the section. Defendant claims that this phrase applies to and modifies all of the section, and that the entire section is in force only until otherwise provided by law. That the legislature may at any time wipe out § 84. This view is not correct. It cannot, for instance, be contended that the legislature may increase or diminish the salary of the said named officials during the term for which they have been elected, yet such a reading as defendant contends for would mean that; namely, "until otherwise provided by law . . . the salary of the said officials shall not be increased or diminished during their term of office." The very act that raised or lowered their salary would "otherwise provide by law." Neither could it be seriously contended that the Constitution reads, "The salary of the commissioner of agriculture and labor shall be as prescribed by law, until otherwise provided by law." To our notion the constitutional convention, composed as it was of a strong mixture of able lawyers and sound-minded laymen, knew of the abuses of the fee system and desired to prohibit it. They first drew said section reading that the officers named should be paid a stated salary which should not be changed during their term of office, and that all fees and profits should be turned into the state

treasury. Their attention being called to the fact that the state would probably be admitted early in November, 1889, and the legislature would not meet for some sixty days, they desired to provide for the said officials in the two months intervening. Thus the section was amended to read that until otherwise provided by law the said official should receive the sum stated. The omission of the commissioner of agriculture and labor from the list of those whose salaries were provided is accounted for by the fact that the office was one newly created by Constitution, and there was no one to draw the salary if one were provided. If the constitutional convention had intended to give the legislature the power to change all of said section, they were wasting their time in having it submitted to a vote of the people, as a legislature, having full power to change its every import, would meet within sixty days after the adoption of the Constitution. On the contrary, I believe that the said section of the Constitution should be read with the phrase "until otherwise provided by law," modifying only the amounts of salaries named therein. Thus it will be seen that the legislature is prohibited from making any other disposition of the fees and profits of the officers named, than to have said sums paid into the treasury.

We feel that the language used is not susceptible of any other construction. Further, we are strengthened in such belief by all of those things of which we can take judicial cognizance. The constitutional convention of this state was not held until 1889, after many other states had tried the fee system and had discarded it for the salary system. Said convention numbered among its members two men who have since represented the state in the United States Senate; two in Congress; two governors; one supreme court judge, several district judges, and one who is now a judge of the United States circuit court. To say that such a body proposed a section of the Constitution providing that it might be changed *in toto* within sixty days is utterly absurd. Our constitutional convention may have felt in sympathy with the supreme court of Pennsylvania, which, about that time, said in the case of Com. v. Mann, 168 Pa. 290, 31 Atl. 1003:

"It may be presumed the legislature knew the old law, the mischiefs or abuses under it. . . . The large compensation of officers paid by fees in large counties for years before was felt to be a wrong on the public; though the grievance was not so sore as farming out the taxes

in France before the French Revolution, it was getting to be of the same character; the compensation of the officer . . . [was] only limited by the amount of fees the officer could wring from unfortunate litigants. He had every temptation to pile up fees. . . . It is difficult for those who have come to the bar since to realize the abuses of the fee system. . . . In that spirit was framed the act of 1876. The legislative intention was to sweep away . . . a pernicious system, by removing as far as possible all motive for illegal exactions."

In the case at bar the temptation would be for the superintendent to do the work himself, thus delaying the publishing of the result, or in hiring members of his own family and thus appropriating indirectly the fees. If the official could not possibly obtain any of the fees, and was obliged to turn the same into the state treasury, this temptation would be removed. In my opinion the constitutional convention intended to guard against this very evil.

This court is authorized by § 7319, Revised Codes of 1905, paragraphs 20, 57, and 60, to take judicial notice of the official acts of public officials and of the journals of each house of the legislature. We avail ourselves of this source of information to note pages 1320 to 1336 of the senate journal of the year 1909. It so happened that the Honorable W. E. Purcell, a member of our constitutional convention, was afterwards a member of the state senate and a member of the investigating committee that found the facts upon which this suit is based. Mr. Purcell is a lawyer of distinction who has served his state in the United States Senate. He certainly ought to know the intent of the constitutional convention of which he had been a member. He was one of a committee of three who passed upon the merits of this very case, and we quote from the report of that committee, signed by him: *"In this case* we do not believe it to be the policy of the law that state officers should receive any fees in connection with the duties of their office over and above the salary which the Constitution and law provides."

This language of a distinguished member of our constitutional convention is merely given as a side light in aiding in determining the intent of said convention.

It is interesting to note, while examining the senate journal above mentioned, that the defendant at that time prepared a written state-

ment, which is reproduced at said pages, in which the following language is used by him: "This work has been handled through this office by the force doing a large amount of extra work." (Page 1336, line 4, 5, and 6 from top.) I mention this in view of the claim now made that the defendant personally did the work after hours, etc.

In brief, my conclusion is that the sums in suit are "fees and profits" of the office held by defendant; that as such they should be covered into the state treasury. That had the legislature of 1901 tried to give them to the defendant, their act would have been unconstitutional and void, but as the said legislature did not attempt to give the fees in this manner the question of the constitutionality of said act is only useful in determining the construction to be given the act of 1901.

FISK, J. (dissenting). I am unable to concur in the views of the majority of the members of the court as above expressed. With due deference to the judgment of my associates I feel that they wholly fail to grasp the controlling legal principles involved in this case. This is quite manifest to my mind from a careful perusal of the majority opinion.

I will here set forth my views as briefly as possible:

It is expressly conceded by the attorney general that the legislature had the unquestioned power, if it so desired, to allow the appellant the moneys thus received from the county superintendents or any balance remaining of such moneys after paying for the necessary clerical assistance in doing the work; but his contention is that the legislature has not *expressly* thus ordained, and that in the absence of such *express* legislative declaration, such unexpended balance should be covered into the state treasury as the property of the state, under § 84 of the Constitution, or, in any event, that such funds should have been turned over by defendant Stockwell to his successor in office. The attorney general, as well as the majority of the court, seem to labor under the idea that in order to confer title to such funds in the officer as an emolument of the office, the legislature must have used *express* and unequivocal language evincing, beyond any doubt, such intent. Such is not my understanding of the law. The rule is elementary that the legislative will may be implied in certain cases where the statute fails to use express language to evidence such will. As well stated in 26

Am. & Eng. Enc. Law, 2d ed. 613: "When the intention of the legislature, as gathered from all legitimate sources, is taken into consideration, terms and provisions, not expressly declared, may be introduced into a statute by necessary or plain implication from what is directly or expressly declared. By 'necessary implication' is not meant an implication that points to a result so as to leave no possible escape and to exclude every other imaginable conclusion, but one that leads to such a conclusion as, under the circumstances, a reasonable view compels the court to take, the contrary of which would be improbable or absurd. . . . When the intention is clear, what is implied in a statute is as much a part of it as what is expressed." In 36 Cyc. 1112, it is stated thus: "The rule is that whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed."

In the light of the above rule, as well as other well-settled rules of statutory construction, I entertain no doubt that the construction placed on said statutory provisions by appellants' counsel is correct. Taking into consideration and applying all legitimate tests for determining the legislative will, I feel impelled to the conclusion that it was unmistakably the legislative intent to authorize the superintendent of public instruction to retain such fees as a flat allowance for the extra duties imposed by said statute, upon the condition, however, that out of such moneys he should defray the expense of the additional clerical assistance required to perform such work. In other words, it was the intent that such fund was to be used *in toto* by such officer for the payment of whomsoever might perform the additional duties called for in such law.

Some of my reasons for this conclusion are the following: In the first place, such added duties are most onerous, and at the time of the passage of the act they were most unusual and contrary to the universal rule of practice in this country, and while I concede that they are germane to the office, it is but natural and highly probable that the legislature should, although not legally required so to do, make some provision to reasonably recompense such officer for the discharge of such added duties. Concededly, this was done to the extent of allowing for the additional clerical assistance required. In the second place, it is evident that the legislature never contemplated that any substantial balance would arise in such fund, or if a balance should

arise, that the same should be turned over to the state, else why did it not provide for its disposition in this manner?

Third, it is contrary to all precedent, and I cannot believe it the legislative intent to enrich its treasury by, to any extent, imposing a tax upon the teaching profession in the state. In the case of fees exacted from applicants for admission to the other professions, the legislature has in no instance, to my knowledge, required any portion thereof to be covered into the treasury for the enrichment of the funds of the state.

Another circumstance of more or less significance is the fact that at the 1899 session of the legislature the bill which was finally enacted into chapter 85, Laws of 1901, was introduced and passed its first and second readings, and later the committee to which it was referred reported a substitute bill, the express provisions of which required the superintendent of public instruction to pay such moneys into the state treasury on the first day of each month or within three days thereafter, and also providing that the same should be kept in a separate fund to be known as "teachers' certificate fund," to be used in paying for such additional clerical work as may be necessary in the office of such superintendent by reason of the provisions of such act, and further providing how such payments should be made. Thus the committee aforesaid recommended a scheme which, had the same been adopted by the legislature, would have, in express and explicit terms, accomplished just what it is now contended was accomplished by the passage of the act in question; but such substitute bill was indefinitely postponed, and at the following session the original bill was reintroduced and passed unchanged as chapter 85, Laws of 1901. It is fair to assume, therefore, that the legislature enacted such statute only after due consideration of the very question here presented. Not only this, but all subsequent legislatures have seemingly acquiesced in the construction placed on such statute by defendant Stockwell and his predecessor in office, in harmony with the contention here made by appellants. Such fact is entitled to some weight, especially where the language of the statute is ambiguous, as is this statute. It is stated on good authority that "if the legislature, by its inaction, has long sanctioned a certain construction, language apparently *unambiguous* may receive from the courts that construction, especially if the usage has been

23 N. D.—8.

public and authoritative." 26 Am. & Eng. Enc. Law, 2d ed. 634, and cases cited.

These are a few general side lights which aid in some degree, at least, to disclose the legislative intent, which is the real object sought to be accomplished by all rules of statutory construction. While I am free to admit that the act under consideration is so unfortunately worded as to greatly obscure, rather than to clearly reveal, the legislative purpose, I think such purpose is fairly and reasonably disclosed by a careful reading of the whole act, especially when considered in the light of other cognate legislative declarations. Taking said statute by its four corners and holding it up to the light of reason and common sense, it seems reasonably certain that the legislative purpose was to authorize the state superintendent to retain all of such dollar payments as a flat or gross allowance to compensate him and such clerical help as he might deem necessary and competent for the performance of such additional work; and it was contemplated, no doubt, that the entire fund would be thus used; for the expressions "shall be used" and "to be used" as employed in said statute with reference to the disposition of such fund by the superintendent, must be given the same meaning as like expressions therein with reference to the disposition of other funds of like nature; and it certainly will not be contended that such expressions, as employed in other portions of said act, do not contemplate a complete devolution upon the state superintendent of the funds therein referred to. When such officer has performed, or caused to be performed, the extra duties entailed by said act, and to this end has expended such sums as are necessary for clerical assistance, he has "used" the fund within the legislative contemplation. The Century Dictionary warrants such construction. The verb "use" is therein defined as meaning, "to employ for the attainment of some purpose or end; avail one's self of;" also, (a) Such employment in a narrower and more restricted sense may be merely transitory and without result or effect upon the thing employed, as "to use a plow;" or (b), in a more comprehensive sense, the employment may imply a complete appropriation, expenditure, or consumption of the thing employed, as, to use water for irrigation or flour for bread. See also Webster's New International Dictionary wherein such verb is defined, among other things, as follows: "To

make use of; to convert to one's service; to avail one's self of; to employ; *to consume or exhaust by using; to leave nothing of;* as, to use up the supplies." See also 29 Am. & Eng. Enc. Law, 439, and 8 Words & Phrases, 7228.

The above construction of the statute in question is not only permissible, but I believe entirely reasonable. The statute does not contemplate that all such extra duties shall necessarily be performed by the clerical assistants therein authorized. On the contrary, such statute provides that the superintendent "shall examine, mark, and file . . . all answer papers," etc., but this mandate is qualified by the later provision that "he may appoint such clerical assistants *as he may deem necessary."* Thus it is apparent by the language employed, that the legislature contemplated that he should or might perform portions of the work without the aid of assistants, for otherwise the words above italicized would have no meaning or proper place in the statute. The words, "or cause to be examined, marked, and filed," as therein employed, must be construed in connection with the words last above quoted. To uphold respondent's contention, therefore, we are driven to the unreasonable and highly improbable conclusion that the legislature did not intend to compensate such officer in the least for the extraordinary duites by it imposed on him. If such had been the legislative intent, I again ask, why did not the legislature make express provision for the disposition of any surplus of the fund which might accrue? Did it conclude that the necessary clerical assistants would always exhaust such fund? Again, if the fund was inadequate to pay for such necessary clerical assistants, was it the legislative purpose to require the superintendent to pay such deficiency and at the same time withhold from him any surplus, should it arise? It seems to me that the more rational conclusion is as I have above indicated. It is a very significant fact that such officer is nowhere, either expressly or impliedly, required to keep any account of the moneys expended by him for such "necessary clerical assistants," or to report such expenditure to any person, and the whole import of the statute is inconsistent with a purpose on the part of the legislature of requiring such accounting. Surely it would seem that this would have been expressly provided for in this statute as is the universal custom in other similar statutes, if respondent's contention be correct.

But the attorney general assumes, and the majority of the court seems to have held, that it was not the intent that any portion of such funds should go to compensate the superintendent for any additional work thus imposed on him, because, as argued, it is not thus provided in express language; and by a course of reasoning the conclusion is reached that, because no provision is made in the statute for the disposition of any surplus arising in the fund, that it must be treated, under § 84 of the Constitution, as "fees and profits" arising from said office and coverable into the state treasury accordingly. Such argument will not stand the test of analysis, as I shall attempt to demonstrate. The same legislature which enacted the statute in question also enacted chapter 95 of the Session Laws of 1901, providing, among other things, that "every state officer . . . required by § 84 of the Constitution of this state, or by any provision of the laws. of this state, to cover into the state treasury all fees and profits arising from such office . . . shall report to the state treasurer monthly the amount of fees or profits received, verified by oath, *and at the same time pay the amount* of such fees or profits *to the treasurer* . . . ." This statute is very broad and explicit, covering *"all* fees and profits" required by § 84 of the Constitution or by any law, to be covered into the state treasury. Is it not, therefore, too plain for argument that the legislature in enacting the law in question did not intend that there should be any balance in this fund which should be treated as fees or profits ? The provisions of said act are wholly foreign to and utterly incompatible with any such intent. The statute provides, "And $1 of said fee shall be used by the superintendent of public instruction for such clerical assistants as he shall deem necessary and competent for the reading of teachers' answer papers and the work connected therewith" and "the expenditures therefor shall not exceed, in the aggregate, the sum annually collected from applicants for this purpose." By this language it was no doubt contemplated that the aggregate of all such unexpended receipts should be available at any time during each year, if not during the entire term of the incumbent, for the payment of such clerical assistants; and how, I ask, could this be true, if, at monthly periods, it must be covered into the state treasury ? The conclusion is irresistible, therefore, that § 84 of the Constitution has no application, and that there is no law requiring any

balance which may accumulate in such funds to be covered into the state treasury. It was not the intention of the legislature that any balance should ever arise to be thus disposed of. On the contrary, as before stated, it was intended that these funds should be consumed *in toto* by such officer, as compensation for the performance of such newly created duties. It seems to me that the whole fallacy of the state's contention and of the reasoning of the majority lies in the unwarranted assumption that these fees are *state funds,* and that an express appropriation was consequently necessary to transfer title thereto to appellant. There is nothing in the statute affording any basis for such contention. Does a statute providing for the payment of fees by private parties to a public officer necessarily evince a legislative intent that such fees shall belong to the public? Clearly not. On the contrary, the fact that as to one half of such fee the legislature has expressly provided that it should be turned into a fund to be kept by the county treasurer, and no similar legislative provision is made for the other one half, is quite persuasive in favor of appellant's contention.

The county superintendent is by this statute, in effect, made the agent or trustee of the state superintendent, to collect from each applicant for teacher's certificate the $1 item, and to transmit same to him. In case of a failure or refusal to carry out such agency or trust, ample remedy can be found to authorize the person thus beneficially interested, to wit: The state superintendent to enforce such trust. The statute should be construed the same as if it provided that each applicant for a teacher's certificate should pay the sum of $1 directly to the state superintendent, to be used by him as aforesaid. It is begging the whole question to say that these payments constitute a *state fund,* and hence that the state is the sole person having a remedy against a defaulting county superintendent. It is likewise begging the question to assert that these dollar collections constitute *public moneys collected for the state.* Whether they are public funds or private emoluments of this officer is the sole and vital question involved. The state in no sense obligates itself to pay the clerical assistants. They are employed by the superintendent and are his servants, and he alone is responsible for their pay. The statute clearly leaves the matter of the employment of such assistants and their

compensation wholly to the judgment and discretion of the state superintendent. The statute merely requires him to do the work or to cause the same to be done, and it, in effect, says: "We care not how much assistance you see fit to employ, you are restricted as to the expense thereof, so far as the state is concerned, to the fees thus collected and transmitted to you for this work." It therefore seems plain that such clerical assistants are not in the employ of the state at all, and such is the express holding in our sister state of South Dakota in a case in all respects identical on principle with the case at bar. There the legislature made an allowance to the probate judge of a certain sum for *"clerk hire,"* and the supreme court held that he was entitled to such allowance whether he in fact employed a clerk or did the clerical work himself. I quote therefrom as follows:

"The probate judge may not desire to appoint, nor may the public service demand the appointment of, a clerk of the probate court with such full and extended powers. Therefore, the legislature wisely left it optional with the judge. The act of March 7, 1889, simply provides that, in counties having 20,000 inhabitants or more, compensation shall be allowed the judges of the probate court for clerk hire; the legislature, no doubt, presuming that in counties having that much population the business of the probate courts would be of such a magnitude that the judge could not reasonably be able to do all the judicial, ministerial, and clerical business coming before it. The enactment is plain and free from all ambiguity. It says: 'There shall be allowed and paid to the judges of the probate courts, . . . for clerk hire,' etc. This clerk may or may not be the clerk of the probate court, as provided in the act of March 8. He need not receive the formality of an appointment. It need not be an officer of the court. It may be any person capable of transcribing or recording papers. It may be a male or female; a minor or a legal voter; a foreigner or a naturalized citizen. There may be no permanency to his employment. It may be for a day or more, *and the liability only extending to the employer,* and he is clothed with no official responsibility. Nor need it be either of these, independent of the judge of the court; for if he performs the duties himself, and does it well and efficiently, the public or county cannot complain, for it can make no difference to it whether the money provided by the act goes into the pocket of the

judge, as his own, or into the pocket of someone else, for doing the work. The legislature evidently intended that this money should be appropriated in these counties, to be used at the discretion of the probate judge, for the good of the public." Gordon v. Lawrence County, 1 S. D. 31, 44 N. W. 1025. There the legislature made a flat allowance for "clerk hire." Here the legislature made a flat allowance for "clerical assistants." Wherein is there any distinction on principle in these cases? See also to the same effect, Bruce v. Dodge County, 20 Minn. 388, Gil. 339, from which I quote: "The words 'The county auditor shall be allowed for clerk hire,' evidently mean that he shall be entitled to receive the percentage allowed for clerk hire in all counties where the valuation amounts to or exceeds $800,000, without reference to whether he in fact employs a clerk or not. In other words, he is entitled to receive the percentage, though he performs in person the labor for which such percentage is intended as a compensation. And even when he employs a clerk or clerks, he is under no legal obligation to pay him or them the full amount of the percentage allowed for clerk hire. He can pay his clerks whatever price is agreed upon, retaining any surplus of the percentage for his own use. In other words, the percentage allowed for clerk hire would seem to be part of the *compensation* allowed the auditor as pay for the discharge of the duties of his office, and a portion of his *salary,* just as is the percentage allowed him in the earlier provisions of the section." If, as no doubt is true, these clerical assistants were the mere private employees and servants of Stockwell, and not of the state (see Anne Arundel County v. Duvall, 54 Md. 350, 39 Am. Rep. 393), is it consistent to hold that the fund out of which they were paid was a *public fund?* Although engaged in assisting him in the discharge of his official duties, they, nevertheless, were working for him, not the state, and they were obliged to look to him alone for their compensation. While it is true that he was supplied with a gross allowance for such purpose by the statutory provision requiring each applicant for teacher's certificate to pay $1 to him for this purpose, such funds, when paid to him, became, as I contend, his private emoluments, burdened, it is true, with a liability on his part to pay the necessary expense of such clerical assistance.

Chapter 51, Laws of 1901, making it a misdemeanor for an officer

to divert to his own use and benefit any allowance made for clerk hire in his office, is cited and relied on in the majority opinion, but in my judgment it does not have the least application. "Clerical assistance," within the meaning of the act in question, is not the same as "clerks" within the meaning of chapter 51, supra. A good case defining the words "clerical assistance," is Beam v. Jennings, 96 N. C. 82, 2 S. E. 245, from which I quote as follows: "The secretary of state is a high and respectable executive officer of state, charged with a variety of important—many of them delicate—duties, that require his personal attention, supervision, and scrutiny. His office is created by the Constitution, and his duties are prescribed by statute.

"It seems to be the purpose of the legislature that he shall personally and alone exercise official authority in the exercise of the functions of his office. There is no statutory provision that he shall have an assistant, deputy, or clerk, so designated, required to take an oath of office, and exercise any official authority. *He is simply allowed $2,000 per annum 'for clerical assistance* . . . in the discharge of his office.' This does not imply *official* assistance,—that the secretary shall appoint a deputy or a clerk, one or more, who are to take an oath of office, and hold office for a definite period of time. Plainly he may employ such 'clerical assistance' as he may need, from time to time, sometimes more, at others less, as occasion and his convenience may require, and such assistance he can change or dispense with at his convenience and pleasure, having in view the public need.

"By 'clerical assistance' is meant, not official assistance, but such as aid in the exercise of official authority by the secretary himself, such as writing letters, making entries of record, copying grants, and the like service. The word 'clerical,' as employed in the statute to designate a kind of help, has no very definite meaning; is not a very apt word for the purpose intended, but it is obvious the legislature did not intend to extend its meaning so as to imply official aid; if so, it would have designated the person to render such aid, as deputy, assistant, clerk, or by some such designation, with a term of office, and required the incumbent to take an oath of office. . . . It would certainly be a very latitudinous and unwarranted interpretation of the words, 'clerical assistance,' to hold that they imply that every person whom the secretary of state may find it necessary to employ to

aid him in the discharge of the 'clerical' duties of his office, as above indicated, shall take an oath of office and represent him in the exercise of official authority. He might, sometimes no doubt would, require half a dozen or more clerks, copyists, and letter writers. Shall they all be sworn as officers? Shall they all represent and act for the secretary officially in the authentication of copies of records, grants, and other papers? If not, which of them shall be sworn? Which of them shall represent him by virtue of the statute, officially, and as to what matters and things?"

The idea that the superintendent must account for any surplus, should it arise, is wholly foreign to the statute. No such accounting is required, and, furthermore, the undisputed facts as found by the trial court effectually refute the idea that a surplus was ever contemplated. Under the findings it was not possible for a single dollar of such surplus to accrue, except by reason of the extra work of the superintendent performed out of office hours; and it is fair to assume that the legislature, before enacting said statute, made an intelligent investigation, which, if made, necessarily disclosed that such would be the result under the practical operation of the law. Certainly it could not have been contemplated that the superintendent would burn midnight oil, and by so doing create a surplus solely for the enrichment of the general fund of the state. His time outside of office hours did not belong to the state. Concededly the superintendent could have and, but for the extra work done by him, would have exhausted every dollar of such fees. Is it logical or sensible to say that while the legislature was perfectly willing to, and did in fact, authorize every dollar of such fees to be devoted to compensating *clerical assistants,* if employed, it, on the other hand, most strenuously objected to any portion thereof being used to compensate for such work, if, perchance it should be performed by the superintendent himself, even though wholly out of office hours? Where is the provision of this law, when the whole act is construed together which evinces any such absurd legislative purpose? It may readily be conceded in accordance with the general rule that a public officer cannot claim extra compensation for official work performed out of office hours, in the absence of a statute to that effect; but this is wholly beside the question. Appellant is not here asserting any such right. He is not asking the state to compensate him for such

work, nor is he seeking to establish an offset or counterclaim therefor, as stated in the majority opinion. His contention is that in legal effect the legislature, by the act in question, has already compensated him by directing these moneys to be paid to him. In addition to the South Dakota and Minnesota cases, supra, I call attention to the recent case of Com. v. Fry, 183 Pa. 32, 38 Atl. 417, wherein that eminent tribunal was called upon to determine a similar question. Under certain statutes of Pennsylvania all applicants for liquor licenses were required to pay to the clerk *"for expenses* connected therewith" the sum of $5; and the court was required to decide whether such fund constituted "fees" of his office within the law of that state, taxing such fees. The court, without a dissenting vote, said: "As to the question whether the sum paid to the clerk of the sessions in liquor license cases is to be regarded as 'fees' within the meaning of the acts which tax fees, we think there is no doubt. While the Acts of 1887 and 1891 both designate the payment as being made for *'expenses,' it is a payment to the clerk which he is at liberty to keep, taking credit against it for* actual expenses paid, and the balance *is therefore an emolument of the office, and under the taxing laws must be regarded as a part of the income of the office."*

Surely if the above is sound, and of this I entertain no doubt, it would seem that appellant's contention in the case at bar is likewise sound, for the two cases are not distinguishable on principle. Manifestly, if such expense moneys, or the unexpended balance thereof, constitute an emolument of the office, as held by the Pennsylvania court, the whole reasoning in the majority opinion based on the assumption that such fees are state funds and should be accounted for, must fail. If the rule announced by the Pennsylvania court be correct, it would be absurd to contend that an accounting of such moneys to the state or to defendant's successor in office is required by any statutory or constitutional provisions. Is it possible that it could have been intended by § 84 of the Constitution to deprive the legislature of the power, on adding new duties to an office, to provide for reimbursing such officer for the expense of such additional clerical assistance as may be made necessary on account of such newly added duties? This, as I read the law, is just what the legislature sought to do by the act in question.

In providing for such expenses, did not the legislature have the right to do as it has done in many other instances, make a flat allowance thereof without the necessity of such officer rendering any itemized account? The statute in question, in legal effect, makes such flat allowance when it requires payment by each applicant to such officer of $1 to be used to cover such additional expenses. In what manner then, and by force of what rule or principle, does such expense money, or any portion thereof, become transposed into either fees or profits within the meaning of the Constitution?

It seems too plain for serious debate that such constitutional provision in no manner restricts the power of the legislature in the matter of allowing not only such expenses, but also additional *remuneration* to the officer for such newly added duties, if it so desires.

It is but fair to the attorney general and his able assistants to state that they make no contention to the contrary in their printed brief in this case.

Another case involving a somewhat analogous principle arose in Indiana in the case of Henderson v. State, 96 Ind. 437. Henderson, who was state auditor, made claim to a surplus of $14,412 collected by him from foreign insurance companies doing business in Indiana pursuant to a certain statute of that state, and the question for decision was: To whom did the fees thus collected belong? Appellant, Henderson, insisted that they were a part of the emoluments of his office, and that he retained them because the law gave them to him in part compensation for his services as such auditor. The attorney general urged that the law required such fees to be collected for the state. The statute authorizing the collection of such fees took effect in 1877. Such act was not amendatory of any existing statute, but was an original enactment imposing new duties on the auditor with relation to foreign insurance companies. Prior thereto, and in 1875, an act was passed requiring the auditor to charge and collect, *for the state* from foreign insurance companies, the same fees as he was previously authorized to charge and collect under a prior statute, to wit: An examination fee of $5 and $2 for each certificate of authority to do business in that state, which amendatory statute further required such auditor at state intervals to make sworn statements of such fees, and pay same

to the treasurer, to be covered in the general fund of the state, with the exception that he was permitted to retain for his services 25 per cent thereof.

Among other things the court said: *"Whenever the general assembly authorizes by new legislation the imposition and collection by a public officer of new and additional fees for the discharge of new and additional duties, we are of opinion that such fees, ex vi termini, when imposed and collected, belong to and are the property of such public officer, unless the law-making power has clearly indicated, in such legislation, that such fees shall be applied in a different way, or to a different purpose. That is, in such a case, no prior legislation would affect or control the appropriation of such fees by such public officer to his own use and purpose. In the case in hand, we do not doubt that the new and additional fees, imposed and collected by the appellant as auditor of state, under the provisions of § 3773, and in controversy herein, belonged to him of right, and were his sole and separate property."*

It is no answer to appellant's contention to cite the various instances wherein the legislature has seen fit to increase the salary or expenses of this officer. Similar increases were made all along the line of state officials in apparent recognition of two well-known facts, *viz.:* increased work in the offices by reason of the increase in population, and the increased cost of living, rendering the old salaries and allowances for expenses wholly inadequate to changed conditions. None of such increases can be legitimately accounted for by reason of *newly added* duties. Hence they furnish no light whatever on the question here involved. Another apparent fallacy in the majority opinion is the unwarranted assumption that an express legislative appropriation, or any appropriation, was necessary to confer these fees on this officer. Starting, first, with the erroneous assumption that these fees are state funds, it is very easy to fall into the second error of concluding that an appropriation is requisite. These fees, as before stated, were never state funds, consequently it is entirely a misuse of the term "appropriation" to use it in such connection. It is of course only state property which may be appropriated by the legislature. The word is defined in 3 Cyc. 565, as follows: "An authority from the legislature, given at the proper time and in legal form, to the proper officers, to apply sums of money out of

that which may be in the treasury, in a given year, to specified objects or demands against the state."

What I have above stated sufficiently answers respondent's other contention, which, in effect, is that in any event such fund belongs to Stockwell's successor in office. Such contention necessarily leads to the conclusion that it was the legislative purpose to create a perpetually augmenting fund in the hands of such officer to be transferred from each retiring incumbent to his successor in office. This is a less plausible argument than the first, and I cannot believe the legislature contemplated any such thing.

The judgment appealed from should, in my opinion, be reversed and the action dismissed.

SPALDING, J. (dissenting). No case before this court since I became a member thereof has received more earnest consideration than the one at bar. Neither has any case developed greater diversity of view or furnished the subject for more conflicting opinions, depending largely upon the point of view or state of mind at different times.

The conclusion arrived at by Judge Burke, regarding the applicability of § 84 of the Constitution, is a very easy conclusion to reach, and is one that on a somewhat superficial view, as I now regard it, when first presented, was very attractive to me.

After further and more careful examination I am satisfied that the conclusion of Judge Fisk is correct, viz., that the fund in question does not constitute fees and profits within the meaning of that section of the Constitution, and that if the legislative intent is material it was intended to make a flat allowance to the state superintendent to cover the expenses thought necessary to be incurred by changing the examination of teachers' papers from the thirty-nine different county superintendents, to a clerical force to be selected by the state superintendent. I do not find it necessary to enlarge greatly on the reasons advanced by Judge Fisk, in support of my conclusions; and offer only a few supplemental suggestions, which seem pertinent. I, however, do not attach more weight to the fact that the work performed by the defendant was done outside regular office hours.

The fallacies on which the conclusions of the majority of this court rest are the assumptions that the money in question is public money,

and that the act of examining the papers is an official duty of the state superintendent. In the opinion written by Judge Goss, attention is constantly misdirected to the acts of the state superintendent, which are unquestionably performed as public duties, but the mind must be applied to the act which we are considering, for a determination of this question. That act does not consist in the superintendence of the examination of papers or in reporting the result to the county superintendent, but the act which we are required to consider is at all times the mental and clerical work of examining and marking the papers. I deem it but just to the defendant to also call attention to the fact that many of the points discussed and attempted to be settled in the majority opinion were never presented or discussed by the defendant or his counsel. They are simply men of straw.

In my opinion, the questions presented are purely political or legislative, and the facts do not disclose a cause of action on behalf of the state. It is practically immaterial whether the legislative intent was to furnish the state superintendent emolument in addition to the prescribed salary.

Constitutional provisions regarding the salary of state officers do not limit the legislature in making provision for the payment of their expenses or for the expenses of running their offices. See Briscoe v. Clark County, 95 Ill. 309; Kirkwood v. Soto, 87 Cal. 394, 25 Pac. 488.

No question of bad-faith, either on the part of the legislature or of the defendant, arises in this case. The legislature, when the law in question was enacted, simply had under consideration a change in the system of marking the examination papers of applicants for teachers' certificates. Theretofore they had been examined and marked by thirty-nine different county superintendents, who did not always interpret the same question the same way, and did not always give equal credit for the same answers. The purpose of the legislature was to change the system and place the work under the supervision of one official, thereby securing substantial uniformity in interpreting the papers, and impartiality in fixing the grades of certificates. It must have been apparent to the legislature that the superintendent of public instruction could not possibly do the work himself. It therefore gave him the oversight, and provided that he might secure clerical assistance to perform

it. Some means had to be provided for paying the expenditure made necessary by this change. It may not have been thought wise to increase the burden of taxation. One dollar had theretofore been collected of applicants for teachers' certificates, for the creation of a teachers' institute fund, and it was thought that the addition of a dollar to the amount so collected from applicants, for the creation of a fund out of which to pay for the examination of the papers, would not be unreasonable. It was therefore provided that the county superintendent should collect $1 from each individual applicant, which dollar he was required to give to the state superintendent for use in payment for the examination of the papers. No burden was cast upon the state. This was specifically guarded against by the provision that such expenditures should not exceed the aggregate sum annually collected for that purpose.

The state superintendent was made the sole judge of the necessity for the expenditure, and was clothed with absolute authority to select the beneficiaries and fix the rate of pay. It may or may not have been contemplated that he would do a portion of the work himself and thereby add to his income. If by reason of superior thrift, hard work, or laboring at unusual hours, he avoided making some of the expenditure contemplated, it does not occur to me that, in the absence of any provision of law regarding it, an implied duty devolved on him to pay a portion of the allowance received into the state treasury. The action in question makes no provision for any of it being paid into the treasury. If it should, accidentally or otherwise, be turned into that office, it could not be withdrawn or made available for the purpose contemplated, as no provision for its withdrawal is found.

The terms of this act, when read in connection with other provisions of law previously enacted, create a conflict which it is our duty to reconcile, if possible. I see no method of doing so except by adopting the construction that the state superintendent was allowed this fund absolutely, for the purpose named. To illustrate some of these conflicts, the examination of teachers are held four times per year, under the statute. Three of the days for holding them are the last Fridays, and, if necessary, Saturdays, of certain months. The law is mandatory, and requires the county superintendent to immediately forward to the state superintendent $1 for each applicant examined. If the law quoted in some of the opinions relating to the transfer of funds by officers into the

state treasury on the first of each month has any application, it takes but little consideration to disclose the fact that the state superintendent would thereby be deprived of the power to use most of this fund for the purpose for which it was intended, or at all. It would go into the state treasury before he could possibly dispose of it, and without any means for its withdrawal to pay for the clerical services required for the examinations. This is not of great weight except as it sheds some light upon the intent of the legislature to turn over the fund to the state official absolutely.

But to return somewhat, the legislature is the sole judge of the necessity for paying a part or all of the expenses of state officials. It can pay and provide for them in either of many different ways. For instance, by allowance, for mileage, for actual disbursements, in lump sums from the state treasury, or by providing for collections from the persons for whom services are rendered.

The legislature exercises its judgment in the selection of a method, and in fixing the amount of the allowance, as well as in determining whether the state or private individuals shall pay it. In the case at bar, it determined that the pay for certain work should be met by the persons for whom the work was performed. It exercised its judgment and discretion in fixing the amount to be collected and allowed for that purpose, and it saw fit to require the payment of $1 from each individual applicant. If it was mistaken in its judgment and $1 is too much, the remedy lies with the legislature, rather than with the courts.

The determining factor is the nature of the work done, in examining papers, by the superintendent. If it is his official duty to perform that work, his salary pays him. But the terms of the law disclose that *the duty of examining the papers is nowhere cast by it upon him. Hence such examination does not become an official duty on his part.* See United States v. Mosby, 133 U. S. 273, 33 L. ed. 625, 10 Sup. Ct. Rep. 327.

It is unquestionably the duty of a state official to devote his entire time, as far as becomes necessary, to the duties of his office. If he fails to do so and engages in private enterprises, this does not afford the state a remedy through the courts for his malfeasance or nonfeasance in office, or neglect of duties. The remedy lies with the electors or with the legislature, or both. In the instant case the defendant saw fit to devote

time out of office hours to the performance of labor which was not imposed upon him by the law, and for which other provision had been expressly made. Had he neglected his official duties and devoted a portion of the time during office hours to the performance of this work, for the reasons theretofore suggested, the state would have no remedy against him in an action at law, any more than it would have had he devoted a portion of his office hours to teaching singing school, or farm labor, for compensation. If the state possesses no legal remedy in cases when the unofficial work conflicts with official duties, it certainly can possess none when no conflict is shown. This is said on the assumption that the legislature has said nothing on the subject; but on the contrary it has said something and has disposed of this proposition. By the terms of the law he was given permission to do this work, but the test is that *he was not required to do it.* Had he been required to do it, it, of course, would have become an official duty. See Ibid.

We are not without instances of parallel legislation, many of which may be said to illustrate the case at bar and furnish the legislative construction, which is entitled to weight in the interpretation of ambiguous language. For instance, the governor was allowed a flat sum for expenses. Vouchers were not required for its expenditure. If he found it necessary to expend less than the allowance, he was the beneficiary. No contention has been noted to the contrary. Similar allowances were made to some other state officials, all of whom, including the governor, are within the terms of § 84 of the Constitution. No one knows whether the allowance made to them exceeded their necessary disbursements while on official duty, or not. It is immaterial, because the legislature exercised its discretion and judgment and fixed the allowance, and did so in good faith.

In the case of the other officials, the allowance was paid to them from the state treasury, while the one we are considering never goes into the state treasury. This makes it much more readily apparent that an accounting is unnecessary. If it was a fund primarily belonging to the state or paid out of the state treasury, the case of the state would be stronger. All state moneys must go into the treasury and be disbursed only on appropriation and through regular channels. No appropriation can be made of funds to which the state has no title. The

23 N. D.—9.

title to this fund after it went into his hands, and until disbursed, was at all times in the defendant.

A similar method of paying expenses of different officials is employed in all parts of the country and in every county of this state. An instance of this is found in the mileage which the law permits sheriffs to collect from litigants for whom they render services. The rate allowed is a flat rate per mile. The object of requiring its payment is to reimburse sheriffs for expenditures incurred in traveling when officially engaged. We know that the mileage fixed is considerably in excess of the necessary expenditures in many instances and undoubtedly so as a whole, but neither the state nor the county is interested in the excess of the allowance over actual disbursements. If the legislature has exercised bad judgment in fixing the rate and made it unreasonable or oppressive, the remedy lies with that body.

It is argued that the burden rests with the defendant to establish clearly that he has a legal right to the fund in controversy. This seems to establish a new doctrine,—that the defendant is presumed guilty until he proves himself innocent; and that the burden of proof is no longer on the plaintiff. I deem it beyond controversy that the burden is on the state to establish its title to the fund; and on its failing to do so the defendant is entitled to a favorable judgment, regardless of his ability to establish title in himself. It is the state which must put its finger, as is said, on the law, bringing this fund within the terms of the constitutional provision. Until it does so it has not made out a case.

The fees and profits referred to in § 84 are those derived from the performance of official duties. It is apparent to me that the fund under consideration is not made up of fees of the office of the state superintendent, neither is it profits in the ordinary sense, for the reasons which I have briefly stated; and possibly also because he did not hire papers examined for a less sum than the allowance. It is not claimed that he could have done so. All the money transferred to him went for the accomplishment of the purpose for which it was provided. It all paid for work, at the rate fixed by the law in question, and, as I have attempted to indicate, if the examination of the papers was unofficial work, that is, work not mandatorily required of his office, some of it, when done by him, was work for which he had a right to retain

pay. The public is in no manner interested in the *personnel* of the examiners of teachers' examination papers. Its interest lies in the direction of having the work correctly, promptly, and impartially done, and to that end that the direction and control be committed to one person. Neither the state nor the public has in any manner suffered. On the contrary, the interests of the public have been served by the acts of the defendant. The claim of the state at best is of the most technical character, devoid of equity, and unconscionable.

I think I have shown that the beneficial purpose of the change in the law which we are considering was to secure uniformity in the markings of examination papers, but if the majority of this court is correct in its suggestion that the beneficial purpose of the legislature was either to increase the superintendent's annual income or to make provision for clerical assistance and to prescribe its payment out of a fund created thereunder, the whole provision is unquestionably rendered invalid. It never was intended as a revenue measure. The revenue feature of it is but an incident to the main purpose.

Many authorities cited in the majority opinions I deem wholly irrelevant. A considerable number simply hold that an official cannot recover from a state or municipality for services to pay for which no provision has been made. An analysis of most of the other authorities cited in those opinions might be of interest, but it would serve no purpose other than to gratify the vanity of the writer and the curiosity of the reader. It will, therefore, not be included in this opinion. However, one or two illustrations will not unduly lengthen it.

Hennepin County v. Dickey, 86 Minn. 331, 90 N. W. 775, is relied upon, but a consideration of the entire opinion would disclose the fact that the services performed by the defendant in that case and for which he retained the fees for which suit was brought were required of him by the statute, and were therefore official duties.

McBrian v. Nation, 78 Kan. 665, 97 Pac. 798, relating to pay for the services of the chaplain of the penitentiary, rendered by him as a school teacher, has no bearing upon this case. The Kansas statute expressly required the chaplain to devote his entire time to the duties of that office. The penitentiary board employed him to perform the other duties, and the court held, in view of the express statute on the subject, he could not devote any of his time to any occupation outside that

of the chaplaincy. Some distinction will be found in the Oklahoma case and in nearly, if not all, the other authorities cited, relating to duties of officials.

In the light of the foregoing considerations briefly expressed, and of most of the reasons advanced by my associate, I am satisfied that no part of the fund in question comes from fees or profits of the office of the state superintendent, within the meaning of § 84 of the Constitution; and that the body of the law on the subject, when construed together, warrants the conclusion that I have reached; namely, that the fund went to the defendant, subject only to the condition that he provide for and secure the performance of the work referred to.

Chief Justice MORGAN having resigned before the petition for a rehearing was filed in the above entitled case, Mr. Justice BRUCE participated in his place and filed the following opinion on February 14, 1912:

### On Petition for Rehearing.

BRUCE, J. This appeal was first presented to and decided by a court of which I was not then a member. It now comes before us on a motion for rehearing, which, under the rules in order to be considered, must show "either that some question, decisive of the case and duly submitted by counsel, has been overlooked by the court, or that the decision is in conflict with an express statute or controlling decision, to which the attention of the court was not called either in the brief or oral argument, or which has been overlooked by the court." (Rule No. 32, 10 N. D. LVI.) Neither of these facts is presented or claimed in the petition. The only new point raised is that a somewhat similar practice as that adopted by the superintendent of public instruction, prevails among the district judges of this state, and that a constitutional question was argued in the opinion of Mr. Justice Burke, which, it is claimed, was waived by the attorney general in his brief and oral argument.

It is a question of somewhat doubtful propriety whether a new member of the bench should, after a full hearing and consideration, and on such a petition, seek to review an adjudication which was rendered by a court of which he was then not a member; but waiving this question,

and all other doubtful questions of propriety, I am of the opinion that no new points have been raised on the motion for a rehearing which would, in any way, affect the majority decision, and I personally believe that the language of the statute is too plain to leave any doubt as to its meaning. The majority opinion filed by Mr. Justice Goss was in no way based upon the constitutional argument, and this opinion was concurred in its entirety by both Chief Justice Morgan and Mr. Justice Burke. Mr. Justice Burke, it is true, argued the constitutional question, but merely as an *additional argument*, and not as the main and only ground of his concurrence.

It is not necessary to a recovery by the state in this case that the fund in controversy should be looked upon either as a fee or as a profit of the state superintendent's office. It certainly was not a perquisite or emolument of the officer. It was a trust fund which was paid to the superintendent of public instruction for one purpose, and for one purpose alone, and that was for the *employment of assistants*. The language of the act appears to me to be very plain. The money collected from the examination fees paid by the respective teachers is required by the act *"to be used* in the support of teachers' institutes or the teachers' training schools in the county as otherwise provided, and $1 of said fee *shall be used* by the superintendent of public instruction for such *clerical assistance* as he may deem necessary and competent for the reading of teachers' answer papers and work connected therewith. Section 876 provides that "each applicant for a county certificate shall pay $2 to the county superintendent, $1 of which shall be paid into the county teachers' institute fund, . . . and $1 of said fee shall be used by the superintendent of public instruction for such *clerical assistance* as he may deem necessary and competent for the reading of teachers' answer papers and *work connected therewith."* "It shall be the duty of the county superintendent," the section continues, "immediately after each examination, to forward $1 for each applicant for teacher's certificate to the superintendent of public instruction, such sums *to be used* by him as *hereinbefore provided."* The only use provided for in this section and in the act is the use *in the employment* of *clerical assistance or clerical assistants;* for that the words "clerical assistants" are synonymous with the words "clerical assistance" is clear from § 869 of the Code of 1905, and of the same act, which provides that "he [the state

superintendent] may appoint such *clerical assistants* as he may deem necessary, but the expenditures therefor shall not exceed, in the aggregate, the sum annually collected from applicants for county certificates *for this purpose.*" It is also to be noted that the act nowhere permits the money to be used for *expenses* incident to the examination of such papers, but merely "for such *clerical assistance* as he may deem necessary and competent for the reading of teachers' answer papers and *work connected therewith.*" This can only mean the work of the *assistants,* and not of the superintendent, in connection with the marking of the papers. The meaning of the act is made still more clear when we consider that that portion of § 869 which relates to the duties of the state superintendent in regard to supervision and filing and examination is separated from the portion or sentence which relates to the use of the money, by a period. It needs no argument to prove that a man cannot be an *assistant* to himself, or *employ* himself.

In no case did the title to the money in controversy become vested in the defendant Stockwell. It was a trust fund which was intrusted for a specific purpose; namely, *the employment of assistants.* Even if it did not come to him in connection with the prescribed duties of his office—and this we do not concede—it came to him, nevertheless as an *agent of the state.* The statute, that is to say, the state, authorized the county superintendents to collect certain fees from the teachers, and of the funds thus collected to transmit a portion to the state superintendent *to be used* by him for a *specific purpose.* It cannot be claimed that in the collection and transmission of the fund, the county superintendents acted in any other capacity than as agents of the state. Except as agents of the state, indeed, they could have been given no power to hold the examinations, nor to collect the money or fees. Any other construction of the law would render it unconstitutional, and there is nothing in its terms which would justify any other construction.

There is no force in the analogy drawn in the motion for a rehearing, between the practice under those statutes which allow a flat sum for expenses to district judges, and the statute in question. We are not here called upon to pass upon those statutes, and we disclaim any intention of doing so. We merely call attention to the fact that in those statutes the sum is a flat sum, granted for a specific purpose, and that purpose is the *personal use* of the judge, and his own comfort and convenience.

The money is provided to *aid the judge,* and not for the purpose of having someone else perform that which otherwise might be considered an implied and absolute duty of the judge himself. In the case at bar the sum is required *to be used* for the employment of *clerical assistants,* and the statute prescribes that the state superintendent shall examine *or cause to be examined.* There is no provision made for him in case he examines, himself. It was probably anticipated that he would but rarely so examine. There is a provision made in cases where *he causes to be examined.* The legislature plainly intended to make it clear that, though the personal examination of papers might be considered by some to be an absolute duty of the officer, it was not their intention that it should be, or that the superintendent should be unduly burdened, but that he could employ assistants for this purpose, and for those *assistants* a trust fund was provided. The intention of the legislature to me appears to be plain. It may be that some individuals have understood, and still understand, the act otherwise; but it is the intention of the legislature, and not even of the authors of the bill, that we must seek to ascertain. In the case of the expenses of the district judge, the provision is made for personal use, and for personal comfort. The money is not required to be used for the *employment* and compensation of others. At any rate, these judicial expenses statutes are not before us, nor have they been adjudicated by this court. This case must stand upon its own foundation, and it is the intention of the legislature in this special instance that we must endeavor to ascertain. To use the language of Mr. Justice Cassoday, in the case of State ex rel. Raymer v. Cunningham, 82 Wis. 39, 50, 51 N. W. 1133, "While such an argument may have weight in construing a doubtful or ambiguous provision, yet it has no force as against the plain language of the clause in question."

The history of the statute is well known. Formerly, and under § 740, Code of 1899, the county superintendents examined the papers. Even then, however, the examinations were held, and the questions marked under the rules and regulations of the state superintendent. Sec. 736, Rev. Codes 1899. The only new duties imposed by § 869 of the Code of 1905 are the duties "to examine, mark, and file, or *cause to be examined, marked, and filed,* all answer papers submitted." There is no doubt of the power of the legislature to impose upon the state

superintendent these new duties, especially since he is expressly allowed to delegate them, and is allowed a fund with which to compensate his *assistants*. The burden upon the respective county superintendents became onerous, and there came a cry for uniformity and greater accuracy in the markings. It was therefore thought that all of the work of the examination of answers should be done in the state superintendent's office, and it was already the duty of that office to prepare the questions. In order to have such extra work done and not unduly burden the state superintendent, a fund was furnished for the *employment of clerical assistants.* No new duty was imposed upon the state superintendent as to general superintendence, and although the examination of the papers might have been held to be a new duty, he was provided with a fund to be used for the employment of assistants, and could delegate the duty. The statute requires such money to be used *for the employment of clerical assistants.* In speaking of the fund it expressly provides a use, and that is in *employing* "clerical assistance necessary and competent for the reading of teachers' answer papers, and work connected therewith." It provides that the state superintendent may appoint such clerical assistants as he may deem necessary, but the expenditures therefor shall not exceed, in the aggregate, the sum annually collected for county certificates *for this purpose.* One cannot be an assistant to himself, or even, technically speaking, of assistance to one's self, nor can he "employ" himself. The law recognizes no doubles.

I do not agree with Judges Goss, Morgan, and Burke that the case of Com. v. Fry, 183 Pa. 32, 38 Atl. 417, is an authority for the state, but I do hold that in the case at bar the facts are materially different, and that the case is hardly an authority for the defendant. If it were an authority, I believe that it states bad law, and a bad public policy. In that case a flat sum of $500 was required to be paid to the clerk of the court by applicants for liquor licenses, "for expenses connected therewith." The terms are general. The fund was for the payment of *expenses.* The amount saved or made out of the fund by the clerk of the court, if any, did not necessarily detract from the compensation or efficiency of others to whom *discretionary* powers had been authorized to be delegated. No others were specifically mentioned. Neither do I believe that the South Dakota case cited in the opinion of Mr. Justice

Fisk is an authority for the defendant. It, in any case, lays down a rule 'of public policy with which I am utterly unable to agree, and which chapter 51 of the Laws of 1901 (Rev. Codes 8645), which makes it a misdemeanor for a public official to appropriate clerk hire to their own use, absolutely repudiates. It announces both a bad and a dangerous doctrine. In that case, as is pointed out in the opinion of Mr. Justice Fisk, the legislature made an allowance to the probate judges of a certain sum "for clerk hire," and the supreme court held that the judges were entitled to such allowance whether they in fact employed a clerk or did the clerical work themselves. "The probate court," the supreme court of South Dakota said, "may not desire to appoint, nor may the public service demand the appointment of, a clerk of the probate court with such full and extended powers. Therefore the legislature wisely left it optional with the judge. The act . . . provides that in counties having 20,000 inhabitants or more, compensation shall be allowed the judges of the probate court for clerk hire; the legislature, no doubt, presuming that in counties having that much population the business of the probate courts would be of such a magnitude that the judge could not reasonably be able to do all the judicial, ministerial, and clerical business coming before it. . . . The legislature evidently intended that this money should be appropriated in these counties to be used at the discretion of the probate judge for the good of the public" [Gordon v. Lawrence County, 1 S. D. 34, 44 N.-W. 1025], and even when he employs a clerk or clerks he is under no legal obligation to pay him or them the full amount or percentages allowed for clerk hire. He can pay his clerk whatever price is agreed upon, retaining any surplus or percentage for his own use. But the public needs good service, and though it should demand that its officers and servants should work hard, it is not to its interest that they should be burdened or overworked. A burdened man renders but inefficient service. A county judge or superintendent of public instruction whose time is taken up with the details of his office, and with clerical work, can render but inefficient judicial and administrative and supervisory service. To say that such an officer may appropriate to himself money which is expressly given to him "for the employment of assistants," and employ no assistants at all, would be to defeat the very purpose of the statute, and promote a general public inefficiency, rather than efficiency. Public officials are merely public

servants, and public statutes cannot be construed differently than the private contracts and obligations of individuals. Would anyone say that if a railway company came to the conclusion that a station agent was overworked and was liable to neglect the general business of the company, and so gave to such station agent $500 to be used "for the employment of station assistance," such agent could dispense with such assistants and keep the money himself? It may be, as Justice Spalding says, that the state superintendent need not have accepted these added duties at all, or agreed to become a trustee of the fund at all, but when he accepted the fund he accepted it impressed as it was with a trust, and for a specific purpose, and he could not use it for any other.

This is a civil, and not a criminal, action, and there is no reason or necessity, in this case, for imputing dishonesty to the defendant. I personally believe that he acted with an honest belief, and without guile. An honest belief, however, does not give legal right, nor does it change the meaning of the clerk provisions of statutory law. To hold that the fund could be appropriated to the personal use of the superintendent would evince an unwisdom on the part of the legislature of which it would be hard to believe they were guilty. The purpose of the act was to promote the cause of education, and educational efficiency, and not to hamper it. It was to promote a thoroughness and competency in the examinations, and not to lower the standard. It was to insure correct and satisfactory markings, and not to lessen the amount of care and thought expended upon the papers. If the state superintendent could have all that he could make out of the fund, or that he could save after paying expenses, there would be a constant temptation to employ cheap and inefficient assistants, and to assume to himself more work than he could reasonably perform. The more work he would expend upon the examinations, the less he could expend in the general discharge of his duties; but the more work and time he thus spent, the more money he would make. The case is very different when a judge is allowed a flat sum for his traveling and other expenses. There parsimony and a strict economy does not result in a public injury, but in the judge's own personal discomfort. The question before us is, as I have suggested, not a question of honesty or of dishonesty, but a mere, naked question of legal right. I have no doubt of the honesty of the defendant. I am equally clear that he has no legal right to the fund in question.

I am of the opinion that the motion for rehearing should be denied.